# 09-3559(L)

## 12-2516, 12-2536, 13-401 (CON)

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

UNI-RTY CORP.
AND
GOLDEN PLAZA LIMITED PARTNERSHIP,
*Appellants*,

v.

GUANGDONG BUILDING, INC., JOSEPH CHU, ALEXANDER CHU,
AND NEW YORK GUANGDONG FINANCE, INC., EASTBANK, N.A.,
*Appellees*.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK, CASE No. 95-Civ-9432

### PAGE PROOF
### OPENING BRIEF AND SPECIAL APPENDIX OF APPELLANTS
### UNI-RTY CORP. AND GOLDEN PLAZA LIMITED PARTNERSHIP

Paul Batista, P.C.
26 Broadway
Suite 1900
New York, NY 10004
(212) 980-0070

Dated:  April 18, 2013

Gregory G. Garre
Katherine I. Twomey
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

*Counsel for Uni-Rty Corp. and Golden Plaza Limited Partnership*
*Additional Counsel Listed on Inside Cover*

Tucker H. Byrd
MORGAN & MORGAN, P.A.
20 North Orange Ave.
Suite 1600
Orlando, FL 32801
(407) 204-9494

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Uni-Rty Corp. and Golden Plaza Limited Partnership state that they are wholly-owned subsidiaries of Golden Pacific Bancorp.  Golden Pacific Bancorp, Uni-Rty Corp., and Golden Plaza Limited Partnership are not publicly owned entities.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF AUTHORITIES ................................................. iv

JURISDICTIONAL STATEMENT ..............................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............................2

STATEMENT OF THE CASE.................................................2

INTRODUCTION ........................................................4

STATEMENT OF FACTS ..................................................7

SUMMARY OF THE ARGUMENT ...........................................30

STANDARD OF REVIEW ................................................32

ARGUMENT ..........................................................33

I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' RICO CLAIMS .........................................................33

    A.    The District Court's Summary Judgment Ruling Upsets Well-Settled "Law Of The Case" Principles ................................35

    B.    The District Court Erred In Concluding That There Was Not A Genuine Issue Of Material Fact On RICO Causation ........................37

        1.    The Evidence Is Sufficient To Create A Triable Issue On Whether Defendants' RICO Violations Prevented Plaintiffs From Exercising The Repurchase Option ................38

        2.    The Evidence Is Sufficient To Create A Triable Issue On Whether Defendants' RICO Violations Prevented Plaintiffs From Retaining The Property Through Other Means ......................................................42

**Page**

3.    The Evidence Is Sufficient To Create A Triable Issue On Whether Defendants' RICO Violations Injured Plaintiffs In Ways Other Than The Loss Of The Property......................47

C.    Allowing The RICO Claims To Proceed To Trial Is Consistent With The Purposes Of RICO's Proximate-Cause Limitation.............50

II.    THE DISTRICT COURT ERRED IN GRANTING DEFENDANT'S RULE 60 MOTION FOR PREJUDGMENT INTEREST ...........................52

CONCLUSION ......................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen v. Coughlin*,
    64 F.3d 77 (2d Cir. 1995) ....................................................................32, 33

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................33, 35

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ..................................................................................50

*Boyle v. United States*,
    556 U.S. 938 (2009) ..................................................................................52

*Bridge v. Phoenix Bond & Indemnity Co.*,
    553 U.S. 639 (2008) ..................................................................................50

*Brunsting v. Lutsen Mountains Corp.*,
    601 F.3d 813 (8th Cir. 2010) .....................................................................34

*De Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009) ...................................................................35, 36

*EP Medsystems, Inc. v. EchoCath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) ......................................................................34

*Fabozzi v. Lexington Insurance Co.*,
    601 F.3d 88 (2d Cir. 2010) ........................................................................32

*In re Frigitemp Corp.*,
    781 F.2d 324 (2d Cir. 1986) ......................................................................53

*Hemi Group, LLC v. City of New York*,
    130 S. Ct. 983 (2010) ...........................................................................33, 34

*Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*,
    574 F.3d 129 (2d Cir. 2009) ......................................................................37

**Page(s)**

*Johnson ex rel. United States v. University of Rochester Medical Center*,
    642 F.3d 121 (2d Cir. 2011) ...................................................................33, 55

*Kerman v. City of New York*,
    374 F.3d 93 (2d Cir. 2004) ...........................................................................35

*Lee v. Joseph E. Seagram & Sons, Inc.*,
    592 F.2d 39 (2d Cir. 1979) ...........................................................................53

*McLaughlin v. American Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) .........................................................................47

*Moore v. PaineWebber, Inc.*,
    189 F.3d 165 (2d Cir. 1999) .........................................................................48

*Nye v. CSX Transportation, Inc.*,
    437 F.3d 556 (6th Cir. 2006) ........................................................................34

*O'Connor v. Boeing North American, Inc.*,
    311 F.3d 1139 (9th Cir. 2002) ......................................................................34

*Old Republic Insurance Co. v. Pacific Financial Services of America, Inc.*,
    301 F.3d 54 (2d Cir. 2002) ...........................................................................55

*Paddington Partners v. Bouchard*,
    34 F.3d 1132 (2d Cir. 1994) ...................................................................33, 54

*Redd v. New York  State Division of Parole*,
    678 F.3d 166 (2d Cir. 2012) .........................................................................37

*Ruotolo v. City of New York*,
    514 F.3d 184 (2d Cir. 2008) .........................................................................55

*Sagendorf-Teal v. County of Rensselaer*,
    100 F.3d 270 (2d Cir. 1996) .........................................................................36

*Standardbred Owners Association v. Roosevelt Raceway Associates, L.P.*,
    985 F.2d 102 (2d Cir. 1993) .........................................................................48

**Page(s)**

*Terminate Control Corp. v. Horowitz*,
   28 F.3d 1335 (2d Cir. 1994) .......................................................................48

*Town of Southold v. Town of East Hampton*,
   477 F.3d 38 (2d Cir. 2007) ........................................................................32

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ......................................................................33

*Uni-Rty Corp. v. Guangdong Building, Inc.*,
   No. 95 CV 09432 (GBD), 2012 U.S. Dist. LEXIS 72901 (S.D.N.Y.
   May 25, 2012).................................................................4, 27, 28, 29, 42

*Uni-Rty Corp. v. Guangdong Building, Inc.*,
   464 F. Supp. 2d 226 (S.D.N.Y. 2006) .........................................3, 26, 34, 51

*Uni-Rty Corp. v. Guangdong Building Finance, Inc.*,
   No. 95 Civ. 9432 (GBD), 2013 U.S. Dist. LEXIS 6033 (S.D.N.Y. Jan.
   11, 2013) .......................................................................4, 30, 53, 55

*United States v. Fernandez*,
   506 F.2d 1200 (2d Cir. 1974) .....................................................................35

## STATUTES

18 U.S.C. §§ 1961 *et seq.*...........................................................................1

18 U.S.C. § 1962.....................................................................................21

18 U.S.C § 1964(a) .................................................................................1

18 U.S.C § 1964(c) ...............................................................................33, 47

28 U.S.C. § 1291......................................................................................1

28 U.S.C. § 1331......................................................................................1

28 U.S.C. § 1367(a) ................................................................................1

**Page(s)**

Pub. L. No. 91-452, 84 Stat. 922 (1970)..................................................52

N.Y.C.P.L.R. § 5001(a) ...........................................................29, 53, 54

N.Y.C.P.L.R. § 5002...............................................................54

## RULES

Federal Rule of Civil Procedure 50 .........................................................24

Federal Rule of Civil Procedure 56 .......................................................47

Federal Rule of Civil Procedure 59 .......................................................56

Federal Rule of Civil Procedure 60 ........................................................52, 53, 56

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C § 1964(a) and 28 U.S.C. §§ 1331 and 1367(a) over this action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and provisions of New York state law.  The district court granted summary judgment for Defendants on Plaintiffs' RICO claims on December 4, 2006, and then held a trial on the state-law claims.  On July 14, 2009, a jury verdict was entered for Plaintiffs on their state-law claims.  Plaintiffs filed a protective notice of appeal to challenge the dismissal of their RICO claims.  Dkt. 215.  The district court entered judgment on May 25, 2012.  SPA-6 (Dkt. 243).  Plaintiffs filed a timely motion pursuant to Federal Rule of Civil Procedure 59(e) for prejudgment interest.  Dkt. 248.  While that motion was pending, Defendants filed notices of appeal.  Dkt. 251, 253. Defendant Joseph Chu then moved to amend the judgment pursuant to Federal Rule of Civil Procedure 60, seeking prejudgment interest.  Dkt. 258.  The district court granted the parties' motions for prejudgment interest and entered an amended judgment on January 16, 2013.  SPA-13–14 (Dkt. 261).[1]  Plaintiffs filed a second notice of appeal of the district court's final judgment order.  Dkt. 263.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] "SPA-__" refers to the Special Appendix attached hereto.  "JA" refers to the Deferred Joint Appendix.  "PX," "DX," and "JSX" refer to exhibits from the 2004 trial.  All transcript references refer to the 2004 trial unless otherwise noted.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.     Whether the District Court erred in granting summary judgment to Defendants on Plaintiffs' RICO claims, even after a jury had found in favor of Plaintiffs on the fact-bound issue of causation and the district court itself had denied Defendants' motion for judgment as a matter of law on that issue.

2.     Whether the district court erred in granting Defendant's Rule 60 motion for prejudgment interest, when the motion did not seek to correct any clerical error under Rule 60(a) or identify any ground for relief under Rule 60(b).

**STATEMENT OF THE CASE**

This case arises out of a decade-long campaign of racketeering activity waged by Defendants in order to obtain ownership of a landmark commercial property—the Golden Pacific Building—in New York's Chinatown.[2]  Plaintiffs filed this suit against Defendants in 1995, alleging RICO violations and various state-law claims, including breach of contract and fraudulent inducement, and claiming that Defendants illegally took ownership of the Golden Pacific Building and injured Plaintiffs' business interests.  Defendants filed cross-claims alleging that Plaintiffs breached various contracts in connection with that property.

---

[2]  A publicly available photograph of the main building and a drawing of that building are reproduced at SPA-24-25.

In 2004, the district court—with Judge Sprizzo presiding—held a jury trial limited to the issue of causation: "Have plaintiffs proven by a preponderance of the evidence that defendant's conduct proximately caused injury to plaintiff's property or business interest?" JA__ (Tr. 480:15-20). The jury answered in the affirmative. The district court denied Defendants' motion for judgment as a matter of law, but granted a new trial. Dkt. 127. Before the new trial, Defendants moved for summary judgment. Dkt. 136. In 2006, the court granted summary judgment for Defendants on Plaintiffs' RICO claims (only), finding that—despite the prior jury verdict and the court's own ruling denying Defendants' JMOL motion—there was no triable issue of causation on Plaintiffs' RICO claims. *Uni-Rty Corp. v. Guangdong Bldg., Inc.*, 464 F. Supp. 2d 226 (S.D.N.Y. 2006); SPA-1–5.

Following Judge Sprizzo's death, the case was reassigned to Judge Daniels. The district court—with Judge Daniels presiding—then held a second trial in 2009 on the state-law claims. The jury returned a verdict for Plaintiffs on two of their state-law claims, finding Defendant New York Guangdong Finance ("NYGF") liable for $8.25 million for breach of contract and finding all Defendants liable for $250,000 for fraudulent inducement. JA__-__ (Dkt. 260 Ex. A). The jury also found that Plaintiffs breached the 1994 loan contract and were liable for $1 million and found that Plaintiffs had breached the 1994 lease by failing to pay rent but awarded no damages on that claim. JA__ (Dkt. 260 Ex. A).

Defendants moved for judgment as a matter of law or, in the alternative, for a new trial.  Dkt. 223.  In May 2012, the district court denied that motion and entered judgment based on the 2009 trial.  *See Uni-Rty Corp. v. Guangdong Bldg., Inc.*, No. 95 CV 09432 (GBD), 2012 U.S. Dist. LEXIS 72901 (S.D.N.Y. May 25, 2012); SPA-6.  Plaintiffs timely filed a Rule 59(e) motion seeking prejudgment interest.  Dkt. 248.  After the time to file a Rule 59(e) motion had passed, Defendant Joseph Chu filed a Rule 60 motion seeking prejudgment interest.  Dkt. 258.  The district court granted both motions for prejudgment interest.  *See Uni-Rty Corp. v. Guangdong Bldg. Fin., Inc.*, No. 95 Civ. 9432 (GBD), 2013 U.S. Dist. LEXIS 6033 (S.D.N.Y. Jan. 11, 2013); SPA-7–12.

On January 16, 2013, the district court entered an amended judgment as follows:  NYGF was liable for approximately $20.5 million ($8.25 million plus prejudgment interest of $12.3 million); all Defendants were liable for $622,636.99 ($250,000 plus prejudgment interest of $372,636.99); Plaintiffs were liable to the late Joseph Chu for approximately $2.5 million ($1 million plus prejudgment interest of $1.5 million).  SPA-13–14 (Dkt. 261).  This appeal followed.

## INTRODUCTION

In this case, two separate juries have found that Defendants' pattern of fraudulent and deceitful conduct injured Plaintiffs by interfering with their ownership of, and efforts to manage, the Golden Pacific Building—a landmark

commercial property in New York City's Chinatown (the "Property").   The overriding question presented by this appeal is whether the district court properly held that there was not even a triable fact issue of causation with respect to Plaintiffs' RICO claims, such that those claims should be dismissed notwithstanding the fact that a jury had already concluded that Plaintiffs were indeed injured by Defendants' relentless campaign to acquire the building.

The evidence overwhelmingly shows that, over the course of ten years, Defendants engaged in a pattern of racketeering activity that included numerous acts of mail and wire fraud, extortion, and other acts designed to financially debilitate Plaintiffs' business and seize control of the Golden Pacific Building from Plaintiffs.  While purporting to engage in a joint venture with Plaintiffs to develop the Property, Defendants were secretly working to take the Property away from Plaintiffs and injure their business interests.  Through a series of transactions from 1989 through 1994, Defendants seized more and more control of the venture and used the false threat of foreclosure as leverage to extract a financing arrangement in which Defendants became the owner of the Property and Plaintiffs became the lessee.  Meantime, they severely injured Plaintiffs' business of managing the Property by diverting tenants from Plaintiffs' property to their own properties and directing tenants to stop paying rent—restricting a critical stream of rental

income—and caused Plaintiffs to incur significant transaction costs that they would not have assumed had they known of Defendants' scheme.

Plaintiffs finally discovered Defendants' fraudulent scheme, but it was too late.  Having suffered the debilitating financial blow of Defendants' actions, Plaintiffs lost the Property and incurred numerous other injuries to their business, including the millions of dollars that they had poured into the building.  From the outset of this litigation, Defendants have sought to shift the focus from their unrelenting misconduct by arguing that Plaintiffs would have lost the building anyway—and so have nothing to complain about.  But that argument is seriously misguided.  There was ample evidence from which a jury could rationally conclude that Defendants' conduct caused Plaintiffs' loss of the Property or other injuries to their business—and a jury found just that in 2004.  In addition to the loss of the building itself, Defendants' wrongdoing also cost Plaintiffs millions of dollars in the form of lost rent and potential tenants, as well as significant transaction costs they incurred in connection with the fraudulently induced transactions at issue.  Those additional injuries alone suffice to establish causation.

This complex case aptly illustrates why causation is an inherently fact-bound issue—ordinarily reserved for a finder of fact.  The district court erred when it took the RICO causation issue away from a jury by granting summary judgment.  This Court should reverse that ruling and remand the RICO claims for further

proceedings.  In addition, the Court should reverse the grant of prejudgment interest to Defendant Joseph Chu on the breach-of-contract claim on which he prevailed.  As explained below, because he waited too long to file a Rule 59 motion to seek such interest, Defendant was forced to seek such interest under Rule 60.  But none of the criteria for Rule 60 relief is met here.

## STATEMENT OF FACTS

This case arises from Defendants' decade-long campaign to wrest control from Plaintiffs of a valuable commercial property located in the heart of New York City's Chinatown.  Golden Pacific Bank[3] had constructed the Golden Pacific Building and was using the building as its headquarters by 1985.  JA__ (Dkt. 38 ¶6 ("Chuang Aff.")).  The main building is a pagoda-style building that is six stories tall and comprises 20,000 square feet of office space and ground floor retail space. *Id.*; JA__ (Dkt. 98 at 4 n.2 (2004 Joint Pretrial Order ("JPTO")).  The Property also includes "an 18,500 square foot, two-story retail building, and a two-story commercial building."  JA__ (JPTO at 4 n.2).  The Property is located at 239-241 Canal Street, 157-201 Centre Street and 1-3 Howard Street in Chinatown.  *Id.*

Plaintiffs Uni-Rty Corporation and Golden Plaza Limited Partnership initially owned the Property during the time period at issue and operated it as a

---

[3] The official title of the bank is "Golden Pacific National Bank," but the documents refer to it as "Golden Pacific Bank," so the brief uses that title.

commercial building.  JA__-__ (JPTO ¶¶1-2).  Plaintiffs are owned by Golden Pacific Bancorp, which was founded by Dr. Chuang and has nearly 300 shareholders.  JA__ (Chuang Aff. ¶6); JA__ (Tr. 92:25:93:9).  Dr. Chuang was the president of Uni-Rty, the general partner of Golden Plaza Limited Partnership, and the sole shareholder of the other partner at all relevant times.  JA__ (JPTO ¶3). Theresa Shieh, a key witness in the case, was an officer of Plaintiffs and operated the Property during the relevant period.  JA__-__ (Tr. 316:22-317:10).

Defendants are Joseph Chu (through his estate), his son Alexander Chu, and a group of entities they controlled:  NYGF, Guangdong Building, Inc. ("GBI"), and Eastbank, N.A.  Joseph Chu, who passed away during this litigation, was one of the wealthiest and most well-known developers in Chinatown.  JA__ (Chuang Aff. ¶14).  NYGF is the lending entity that is a party to the loans with Plaintiffs at the heart of the dispute.  GBI is a company that Joseph Chu created in 1993 solely for purposes of holding title to the Property after the 1994 Transaction.  Alexander Chu was an officer at NYGF, JA__ (Tr. 359:1-3), and the President and Chairman of the Board at Eastbank, JA__ (JPTO ¶9), which lent money to Plaintiffs in connection with the Property and held Plaintiffs' accounts relating to the Property.[4]

---

[4]  The Hong Kong and Shanghai Banking Corporation Limited ("HSBC") was initially a defendant but was dismissed from the suit on the second day of the 2004 trial pursuant to a settlement agreement.  *See* Dkt. 105; JA__ (Tr. 148:3-8); JA__

### *Plaintiffs' Reacquisition Of The Property From The FDIC*

Golden Pacific Bank was using the Property in 1985, when the FDIC closed the bank and took control of the Property.  JA__-__, __-__ (Chuang Aff. ¶¶6, 11).  Documents indicate that even at this early stage, Joseph Chu wanted to acquire the Property.  JA__-__ (*id.* ¶12).  During the same period, Dr. Chuang was dealing with legal difficulties stemming from his involvement in Golden Pacific Bank.  He was indicted in 1987 regarding his management of the bank and convicted in 1989.  JA__-__ (JPTO ¶11-12).  Theresa Shieh, a representative of Golden Pacific Bank, was also charged and found guilty.  JA__-__ (Tr. 333:17-20).  Despite these personal difficulties, Dr. Chuang continued to work on behalf of the shareholders of Golden Pacific Bancorp to reacquire the Property from the FDIC.

While these negotiations were ongoing, Joseph Chu approached Dr. Chuang ostensibly to help Dr. Chuang regain the Property, so that they could jointly develop it.  JA__ (Chuang Aff. ¶15); JA__ (Tr. 249:7-10).  In early 1989, Dr. Chuang discussed the Property with Joseph Chu and told Chu that he was going to sell some assets in Taiwan to repurchase the Property.  JA__ (Chuang Aff. ¶18).  Chu instead encouraged Dr. Chuang that they should work together and advised Dr. Chuang that they could profit more by renovating the Property and using Chu's connections to attract high-end tenants.  JA__ (*id.* ¶19).  In furtherance of this plan,

(*id.* at 154:12-15).  HSBC is not a party to this appeal.

in March 1989, NYGF sent Dr. Chuang a Commitment Letter in which it agreed to lend Golden Pacific Bancorp $700,000 for a one-year term in exchange for a second mortgage on the Property (subordinate to the FDIC's mortgage) and a personal right of first refusal for Alexander Chu on the sale and rental of the Property for 10 years. JA__ (Chuang Aff. Ex. 3). Dr. Chuang signed the Commitment Letter on behalf of Golden Pacific Bancorp on April 1, 1989. *Id*.

Meanwhile, Alexander Chu was secretly working behind the scenes so that Defendants could acquire the Property themselves. He sought approval of a loan from HSBC so that Defendants could purchase the Property. *See, e.g.*, JA__-__, __-__ (Chuang Aff. ¶16 & Chuang Aff. Ex. 2). In related correspondence in January 1989, HSBC stated that it would "assist [Defendants'] purchase of the Golden Pacific Bank property" and that the purpose of the loan was to "finance the acquisition of" the Property. JA__, __ (Chuang Aff. Ex. 2). Alexander Chu stated that Defendants would undertake a feasibility study "as soon as we have acquired the rights to the property." JA__ (*id.*). Joseph Chu was telling Plaintiffs that he wanted to help jointly develop the Property, but these documents and other evidence demonstrate that from the very beginning Defendants were hiding their true intentions and scheming to defraud Plaintiffs of the Property.

On May 9, 1989, Plaintiffs purchased the Property back from the FDIC for $11 million. JA__ (Chuang Aff. ¶24); JA__, __ (Tr. 93:14-15, 102:15-17). The

purchase price was comprised of a $6 million first mortgage loan from the FDIC, an $800,000 second mortgage loan from NYGF (which was actually financed by Eastbank), a $300,000 loan from Eastbank, and Plaintiffs' own cash.   JA__ (Chuang Aff. ¶¶21-22, 24).   Plaintiffs paid the costs associated with the loans. JA__ (Chuang Aff. Ex. 3).   In connection with the $800,000 loan, Uni-Rty granted Alexander Chu personally a right of first refusal on the Property for ten years. JA__-__ (Chuang Aff. Ex. 4).   Already by this point in time, Plaintiffs had invested approximately $5 million in the Property.  JA__ (Tr. 102:15-17).

### *1990 Transaction*

Throughout the period, Joseph Chu continued to pressure Plaintiffs to borrow more funds in order to renovate the Property ostensibly so that they could work together to attract high-end tenants.  Chu convinced Plaintiffs to refinance the Property, claiming that Plaintiffs would not be able to borrow money for renovations under the FDIC mortgage.   JA__-__ (Chuang Aff. ¶¶30-31).   Chu proposed that they enter into a joint venture agreement and that he would arrange the financing.   But while he was purporting to help Plaintiffs, Chu was secretly working against them to obtain the Property.  Indeed, Defendants told HSBC that they intended to "tak[e] over" the Property in their own name.  JA__-__ (*id.* Ex. 8).

Ultimately, the parties entered into a Joint Venture Agreement and a number of loans and mortgages.  Dr. Chuang had made clear to Chu that he did not want

the funds to come from his bank's rival—HSBC. Chu repeatedly assured Plaintiffs that the loans would not come from HSBC. But he lied again. JA__ (*id.* ¶31).

Joint Venture Agreement. Plaintiffs and NYGF executed the Joint Venture Agreement ("JVA") on February 14, 1990. JA__-__ (PX 68). The JVA labeled Plaintiffs the "Owner" and NYGF the "Developer." JA__ (*id*. at 1). The JVA makes clear the parties' intent to work together to develop the property. *See id*. The parties agreed to work together and "devote such time and effort to the Venture as they deem necessary to promote adequately the interests of the Venture and the mutual interests of the Venturers." JA__ (*id*. ¶9). The parties agreed to consult with each other, stating that "[NYGF] shall be consulted on all major decisions concerning the Venture" and that the "Venturers shall keep each other apprised of all areas of activity on behalf of the Venture on a current basis." *Id*. ¶10. And further cementing the relationship, the parties agreed to an "equity kicker" pursuant to which NYGF would receive a 10% equity interest in Plaintiffs that, in turn, entitled NYGF to 10% of Plaintiffs' profits. JA__-__ (*id*. ¶4). Furthermore, upon maturity or repayment of the loan, NYGF had "the option to have said interest purchased by [Plaintiffs] for the sum of $2,000,000.00," which Plaintiffs "secured by a subordinate mortgage covering the Property." *Id.*

Although the parties agreed to work together, the JVA makes clear that Defendants had control over certain decisions, including leases. The JVA

acknowledges that Alexander Chu, pursuant to the prior loan agreement, "holds a right of first refusal in connection with any sale, lease or license of all or part of the Property, which does not expire until May 9, 1999." JA__ (*id*. ¶5). The JVA also gives NYGF a similar right of first refusal. *Id*. ¶7.

Refinancing. The refinancing under the JVA was accomplished in two parts.

*First*, Plaintiffs received a $9 million mortgage loan from NYGF. JA__-__ (DX BB); *see also* JA__ (Tr. 235:22-25). The principal was due on February 1, 1994, and Plaintiffs owed monthly interest payments. JA__ (DX BB at 6). It required Plaintiffs to pay all taxes, assessments, water and sewer rents, and other public charges assessed against the Property, and to certify that they had done so. JA__-__ (DX BB §1.06). Foreclosure was a remedy for default. JA__-__ (DX BB §2.03). NYGF funded the $9 million loan through HSBC and immediately assigned the $9 million mortgage to HSBC. JA__ (Chuang Aff. ¶¶70-71). Joseph Chu personally guaranteed the loan to HSBC. JA__ (Tr. 309:14-15).

*Second*, Plaintiffs received a $ 1 million construction loan from NYGF, at an interest rate of prime plus 2% with the principal due on February 1, 1994. JA__-__ (DX CC); JA__-__ (DX DD); *see also* JA__ (Tr. 239:10-14, 19-22). Plaintiffs issued NYGF a $1 million mortgage in connection with this loan, which was subordinate to the $9 million mortgage. JA__-__ (DX EE); JA__ (Tr. 239:23-25).

The agreements required Plaintiffs to pay all costs associated with all of the loans and mortgages issued in the 1990 Transaction.

Plaintiffs used the funds to pay off the FDIC mortgage and the prior NYGF mortgage, and $900,000 went into a reserve fund to pay interest due on the $9 million loan from NYGF.  JA__ (Tr. 234:4-20); JA__-__ (DX AA).  After the 1990 Transaction, the Property went from being encumbered with approximately $6.5 million in mortgages,  JA__ (Tr. 102:8-14), to approximately $12 million, *see supra* at 12-13, but Plaintiffs received only between $800,000 and $900,000 in working capital for renovations.  JA__ (Tr. 110:12-15).

### *Plaintiffs' 1990-1994 Efforts To Renovate And Manage The Property*

After the 1990 Transaction, Plaintiffs tried to renovate the building.  But by 1993, they were only able to renovate 50% of the building because the approximately $850,000 in working capital was not enough to complete the renovations, which were estimated to cost $3 million.  *See* JA__, __, __ (Tr. 111:10-11, 113:8-14, 258:4-5); JA__-__ (DX CC).  Because the renovations were not complete, Plaintiffs could not rent out the entire property.  JA__ (Tr. 122:13-17).  During this period, Defendants did not bring any tenants to the Property. Instead, unbeknownst to Plaintiffs, they *diverted* tenants identified by Plaintiffs to Defendants' *own* properties after Plaintiffs submitted tenants' names to NYGF for approval, including Fernando's (a well-known jeweler) and Manhattan Optical,

and they also sabotaged potential leases with the Vegetarian Restaurant and Prudential Insurance Company. *See* JA__-__ (Tr. 318:2-322:3); JA__-__ (Dkt. 270 ("Shieh Aff."), Ex. 1 at 173:20-211:24 ("Shieh Dep."). These tenants would have provided an estimated $1.2 million in additional rent. JA__ (*id.* Ex. 3).

While Defendants were secretly subverting Plaintiffs' efforts to rent out and operate the Property, Plaintiffs were pouring more of their own money into the Property under the belief that Defendants were acting in good faith to advance the interests of the *joint* venture. In 1992, Plaintiffs sold a property in Taiwan for $650,000 in order to pay the interest and taxes. JA__-__ (Tr. 120:18-121:1). Even with these additional funds, by early 1993, the Property was not generating enough income to satisfy its debt obligations. By January 1994, Plaintiffs owed NYGF $1.2 million in back interest and related charges, and they owed the city $1.4 million in real estate taxes. JA__-__ (JPTO ¶15). The outstanding principal of $10 million was also coming due in February 1994.

Dr. Chuang discussed the situation with Joseph Chu in an attempt to reach a solution in both parties' best interests. Chu told Dr. Chuang that HSBC was threatening to foreclose the Property pursuant to the 1990 mortgage. JA__ (Tr. 310:8-9); JA__ (*id.* at 130:11-15). In fact, however, HSBC had repeatedly told Chu that it would *not* foreclose the property and instead was going to pursue Chu's personal guaranty. JA__-__, __, __ (*id.* 286:19-25; 308:18-24, 310:2-7). A telex

from HSBC states: "In a meeting with Ch[u] I made it clear that I would not entertain his wish for us to foreclose on NYGFI and then he would purchase the property." JA__ (Chuang Aff. Ex. 14). NYGF would have been in violation of its 1990 agreement with HSBC if it foreclosed the Property without HSBC's permission, JA__ (Tr. 287:12-23), and pursuant to its December 8, 1993 Commitment Letter with HSBC, it was required to obtain HSBC's written consent to foreclose, JA__-__ (*id.* at 366:19-367:24); JA__-__ (PX 240 at 7-8).

At the same time that Chu was falsely telling Plaintiffs that HSBC would foreclose on the Property, Defendants were negotiating an extension of their loan agreement with HSBC. JA__-__ (Tr. 289:20-290:12); JA__-__ (PX 240). They did not tell Plaintiffs about the extension. *See* JA__-__ (Chuang Aff. ¶¶85-90). Ultimately, Defendants borrowed an additional $4 million from HSBC and extended the $9 million loan from the 1990 transaction for an additional three years. JA__-__ (Tr. 289:20-290:4); JA__ (PX 240 at 2).

Defendants appreciated that the Property had significant commercial value. During this period, Joseph Chu showed Theresa Shieh a proposal to turn the Property into condominiums, which indicated that it would be worth $24 million. JA__-__ (Tr. 325:11-336:11). Defendants also secretly showed the property to a Taiwanese group at an asking price of $16 million. JA__-__ (Chuang Aff. ¶81).

Alexander Chu admitted that they were trying to find buyers for the Property, but did not tell Plaintiffs—their joint venture partners. JA__-__ (Tr. 358:10-359:12).

Defendants promised to arrange new financing to replace HSBC and that they would lend Plaintiffs funds to complete the renovation of the Property and pay off the real estate taxes. JA__ (*id.* at 128:8-10). Joseph Chu told Dr. Chuang that he had found a friend in Hong Kong to finance the project. JA__, __ (*id.* at 129:12-17, 254:8-13). Chu also told Dr. Chuang that the new lender required Plaintiffs to transfer the deed to the Property to the new lender. JA__-__ (*id.* at 241:13-242:13). Plaintiffs did not seek other financing because of Chu's promise and NYGF's obligations under the JVA. JA__-__, __-__ (*id.* at 179:15-181:25, 329:17-330:18). Ultimately, NYGF and Plaintiffs entered into a series of transactions that closed in 1994 and have been a focus of this litigation.

### *1994 Transaction*

In 1994—leveraging the fraudulent HSBC foreclosure threat that Defendants had concocted—Defendants convinced Plaintiffs to deed the Property to GBI in exchange for GBI's assumption of the $10 million in loans, Joseph Chu's extension of a $3 million loan, and a lease with a two-year non-renewable option for Plaintiffs to repurchase the Property.

Contract of Sale and Leaseback with Option to Repurchase. On February 25, 1994, Plaintiffs and GBI closed the Contract of Sale and Leaseback with

Option to Repurchase. JA__ (JPTO ¶¶17-23) . Pursuant to the agreement, GBI assumed Plaintiffs' $10 million liability for the 1990 loans, but it did not cancel the notes or Dr. Chuang's personal guaranty. JA__-__ (Tr. 197:16-199:18). GBI also agreed to arrange for a $3 million loan to Plaintiffs, discussed below. Plaintiffs were required to pay Chu a $200,000 conveyance fee. JA__ (JPTO ¶21(b)). In exchange, GBI leased the building back to Plaintiffs with an option to repurchase it within two years. JA__ (JSX 2 ¶13.1). Plaintiffs' rent was set at $500,000 per year in monthly installments and $500,000 per year due at the end of the lease (the deferred rent). §2.1. Plaintiffs had to obtain GBI's approval for changes or alterations to the premises, JA __ (*id*. ¶7.2), and for new leases. JA__ (*id*. ¶9.4). The agreement specifies various events of default, including failure to pay rent or to comply with other terms of the lease. JA__-__ (*id*. ¶10.1.1).

The agreement gives Plaintiffs the option to repurchase the Property at any time within two years of the beginning of the lease for $10 million plus all deferred net rent minus certain other sums. JA__-__ (*id*. ¶¶13.1, 13.3). The purchase is also contingent on repayment of the principal of the $3 million loan by Joseph Chu and the $300,000 loan by NYGF. JA__ (*id*. ¶13.5). It also states that the parties recognize that Plaintiffs "will be obtaining financing in order to perform on this option to repurchase." JA__ (*id*. ¶13.10).

Loans.   Separately, Joseph Chu extended a $3 million loan to Plaintiffs. JA__ (JPTO ¶21(b)).   But Plaintiffs received only $316,018 in cash for renovations.  *Id*.  The rest of the funds went to NYGF to pay off mortgage arrears, to Chu as a conveyance and loan fee, to the city to pay off real estate and other charges, to Chu & Partners for certain liens, and to GBI as the first month's rent. *Id.*  Plaintiffs agreed to pay 10% annual interest on the loan, with 5% payable each month and 5% deferred until maturity of the loan in February 1996.  JA__-__ (JSX 35).  Dr. Chuang personally guaranteed the deferred interest.  JA__-__ (JSX 37).

NYGF extended a $305,587.14 loan at the prime rate with the principal and interest due in February 1996, JA__ (JSX 36), which Dr. Chuang guaranteed.

JVA.   Plaintiffs and NYGF also amended the 1990 Joint Venture Agreement.  JA__-__ (JSX 3); JA__-__ (PX 138).  They agreed that Plaintiffs would pay interest on the $2 million equity kicker beginning on the date they exercised the option to repurchase the Property or the date their lease expired. JA__ (JSX3 ¶(1)(e)).  Dr. Chuang personally guaranteed the equity kicker.  *Id.*

At the same time as the 1994 Transaction, GBI assigned 50% of its interest in the equity in the Property to NYGF for $6.5 million.  JA__ (JSX 33).

### Plaintiffs' 1994-1995 Efforts To Improve And Manage The Property

Meantime, Plaintiffs continued to try to improve and manage the Property. By the time Defendants took control of the property in the summer of 1995,

Plaintiffs had fully renovated the Property. JA__ (Tr. 259:10-21). Leading up to their seizure of the Property, Defendants told the tenants to stop paying rent to Plaintiffs in April 1995, claiming—falsely—that there was a lawsuit. JA__-__ (*id.* at 327:8-328:18). Half of the tenants stopped paying rent. JA__ (*id.* at 327:9-13). Defendants also thwarted a potentially lucrative lease with Off Track Betting for 14,000 square feet of the Property, which would have resulted in up to $8 million in revenue over ten years. JA__-__ (*id.* at 322:8-323:11); JA__-__, __-__ (Shieh Dep. at 157:17-159:21, 166:7-167:24); JA__ (Shieh Aff. Ex. 2 at 4). Theresa Shieh thought this lease would be a "life sa[v]er" and was "so happy," but Joseph Chu refused to approve the lease. JA__-__ (Shieh Dep. at 159:17-160:24). Plaintiffs also tried to list the Property for sale, but Defendants had already listed it with the same broker. JA__-__ (Tr. 323:12-324:6).

Plaintiffs stopped making payments on the lease in May 1995, JA__ (DX II at 2), when they discovered Defendants' fraudulent scheme to cut off Plaintiffs' right to repurchase the Property. At this point, they also reportedly were in default of the lease because they allegedly owed the city real estate taxes. Defendants sent Plaintiffs an eviction notice on July 19, 1995, stating that Plaintiffs had failed to pay $216,588.77 in rent. JA__-__ (DX II). They demanded that Plaintiffs pay the rent by July 31, 1995 or vacate the premises. *Id.* Plaintiffs later filed for bankruptcy. JA__ (Dkt. 136 ¶12 (O'Connell Aff.)).

### *Plaintiffs File Suit Against Defendants*

Plaintiffs filed suit on November 6, 1995, against Defendants, alleging RICO and state-law violations arising out of Defendants' long-running scheme to frustrate Plaintiffs' efforts to develop and manage the Property and take control of the Property. Dkt. 1. Defendants moved to dismiss the complaint and for summary judgment in 2000, claiming, among other things, that Plaintiffs could not show that Defendants' misconduct caused their injuries. JA__-__ (Dkt. 34 at 33-34). The district court denied Defendants' motion. Dkt. 45.

After additional discovery, Plaintiffs filed an amended complaint on February 23, 2001 against Defendants. JA__-__ (Dkt. 46). Counts I through IV alleged violations of RICO, 18 U.S.C. § 1962. JA__-__ (*id.* ¶¶106-33). Plaintiffs alleged "racketeering activity" with predicate acts of mail and wire fraud, extortion or attempted extortion, commercial bribery, and money laundering, JA__, __-__, __-__ (*id.* ¶¶109, 121, 129-31), which injured Plaintiffs "in their business and property," JA__ (*id.* ¶108). For example, "[e]ach mailing by the defendants of the loan documents, demands for payment, or any other mailings sent in furtherance of the overall fraudulent scheme" constituted mail fraud because they "contained material misrepresentations and omissions" or "were prepared and mailed in furtherance of defendants' scheme to defraud." JA__ (*id.* ¶129). An affidavit by Dr. Chuang describes in detail the dozens of mailings and facsimiles sent and

received by and among Defendants in furtherance of the fraudulent scheme alleged in the complaint.  *See* JA__-__ (Chuang Aff. at 5-53).

Plaintiffs also brought state-law claims for breach of fiduciary duty, tortious interference with contractual and business relations, fraud, and unjust enrichment claims against Defendants, and filed a separate claim for breach of contract against NYGF only.  *See* JA__-__ (Dkt. 46 ¶¶134-59).

Defendants Joseph Chu, NYGF, and GBI, in turn, filed three counterclaims against Plaintiffs:  (1) failure to pay the 1994 $3 million loan; (2) failure to pay the 1994 $305,587.14 loan; and (3) failure to pay rent of $1,638,187.03 under the 1994 lease.  JA__-__ (Dkt. 54 ¶¶194-219).

Defendants again moved for summary judgment, again arguing, among other things, that Plaintiffs could not establish causation.  JA__-__ (Dkt. 77 at 20-24). The district court again denied summary judgment, Dkt. 86, and then set the case for trial on causation only, JA__ (Dkt. 87 at 48:11-16).

### 2004 Trial On Causation

In 2004, Judge Sprizzo presided over a four-day trial on causation.  The following witnesses testified at trial: Dr. Chuang, Anthony Colombini (an officer for Defendants NYGF and GBI), Joseph Chu, Theresa Shieh, Alexander Chu, and Robert Jenkins (Defendants' appraisal expert).  In addition, the parties submitted numerous exhibits including the relevant documents.

Plaintiffs argued that Defendants caused them injury in multiple ways: *e.g.,* by causing them not to seek alternative financing by interfering with potential tenants (including the potentially lucrative lease with Off Track Betting), directing 50% of the tenants to stop paying rent, and thwarting their efforts to sell the Property. *See* JA__-__ (Tr. 453:3-456:19). Defendants, in turn, argued that the 1994 Transaction was Plaintiffs' only alternative to foreclosure and that Plaintiffs ultimately lost the building because of the declining values in the real estate market during the 1990s. *See* JA__-__, __-__ (*id*. at 67:1-76:7, 429:2-443:2).

The parties disputed the value of the Property. Plaintiffs presented evidence that Defendants valued the Property at $24 million before the 1994 Transaction. JA__ (PX 147). Defendants' appraisal expert testified that the Property was worth less than its outstanding debt in 1994, though he acknowledged that the appraised value of the Property was trending up in line with the market generally. JA__, __ (Tr. 411:12-25). Defendants focused heavily on Dr. Chuang's and Theresa Shieh's prior convictions and personal relationship (they eventually married in 2004), in an effort to prejudice the jury and deflect attention from Defendants' misconduct. *See* JA__-__, __-__ (*id*. at 247:23-248:10, 333:17-334:14).

The district court instructed the jury on proximate cause, JA__ (*id*. at 469:1-25), and erroneously suggested that the *only* injury could be the loss of the building. After Plaintiffs' counsel objected, the court clarified that as it "saw the

case, the essential injury to business or property was the loss of the building," but noted that its view of the case was not binding on the jury and "[i]f you find some other injury that's up to you."   JA __(*id.* at 478:11-15).   After deliberating and requesting various exhibits from the court, the jury returned a verdict in favor of Plaintiffs, answering "yes" to the following key question:  "Have plaintiffs proven by a preponderance of the evidence that defendant's conduct proximately caused injury to plaintiff's property or business interest?"  JA__ (*id.* at 480:15-20).

### District Court Grants A New Trial

Defendants filed a renewed motion for judgment as a matter of law under Rule 50(b) and, in the alternative, a new trial under Rule 59.  Defendants repeated the argument—twice previously rejected on summary judgment—that Plaintiffs could not establish RICO causation because they could not show that Defendants caused the loss of the Property.  JA__-__ (Dkt. 112 at 12-16).

The district court denied Defendants' Rule 50(b) motion but granted their motion for a new trial.   JA__-__ (Dkt. 127).   In explaining the denial of Defendants' Rule 50(b) motion, the court stated that it "cannot conclude that there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture."  JA__ (*id.* at 1) (citations and internal quotation marks omitted).  In particular, the court pointed to "Theresa Shieh's trial testimony on defendants' alleged lease

-24-

interference, *see* Trial Transcript at 318-23, 326-28, which the jury could have found supported Plaintiffs' argument that their ability to comply with the sale leaseback agreement … was seriously impaired by defendants' conduct after the sale leaseback agreement was entered into." JA __-__ (*id.* at 1-2).

The district court nevertheless granted Defendants' motion for a new trial, stating that the jury's verdict was "'against the weight of the evidence'" given the evidence presented at trial "demonstrating plaintiffs' financial distress during the relevant time period, and the lack of evidence quantifying any losses caused by defendants' alleged lease interference." JA__ (*id.* at 2) (citation omitted).

### District Court Grants Summary Judgment On Plaintiffs' RICO Claims

Defendants, with the court's permission, conducted additional discovery and deposed Dr. Chuang and Theresa Shieh in March 2005. Theresa Shieh described multiple instances of lease interference both before and after the 1994 Transaction, and she provided the quantification of those losses that the district court had previously found lacking. She testified that, before the 1994 Transaction, Defendants interfered with potential leases with the Prudential Insurance Company, the Vegetarian Restaurant, Fernando's (a prominent jeweler), and Manhattan Optical. JA__-__ (Shieh Aff. ¶¶17-18 (citing deposition)). That interference prevented Plaintiffs from collecting about $1.2 million. JA__ (*id.* Ex. 3). After the 1994 Transaction, in the spring of 1995, Joseph Chu told tenants to

stop paying rent. JA__ (Shieh Dep. at 49:4-50:24). In addition, Defendants interfered with a lease with Off Track Betting offering over $600,000 in the first year and over $8 million over ten years. JA__ (Shieh Aff. Ex. 2 at 3). Dr. Chuang was also deposed and confirmed Shieh's testimony and provided additional information. *See generally* JA__-__ (Dkt. 268 Ex. 1 ("Chuang Dep.")).

Defendants moved for summary judgment. Dkt. 136. Nothing had changed, except the addition of the new depositions by Dr. Chuang and Theresa Shieh. The district court denied the motion as to the state-law claims. But—in direct contravention of its prior ruling denying Defendants' JMOL motion—the district court granted summary judgment as to the RICO claims. *See Uni-Rty Corp. v. Guangdong Bldg., Inc.*, 464 F. Supp. 2d 226 (S.D.N.Y. 2006). In doing so, the court stated that Plaintiffs had failed to "trace[] the alleged RICO violation to the injury." *Id.* at 230. Instead, the court stated, the evidence establishes "that plaintiffs did not have the financial resources to keep the building and that they would have lost the building regardless of defendant's conduct." *Id.* at 231.

The court denied summary judgment as to the "lease interference claims," concluding that "there is competent evidence that the defendant[s] improperly interfered with plaintiff's leases." *Id.* Those claims proceeded to trial.

### *2009 Trial On State-Law Claims And Post-Trial Motions*

In 2009—after Judge Sprizzo passed away and the case was reassigned to Judge Daniels—a seven-day jury trial was held on the state-law claims. The jury returned the following special verdict: (1) NYGF breached the JVA, causing Plaintiffs $8,250,000 in damages; (2) Defendants made false representations that fraudulently induced Plaintiffs to enter into the 1994 sale leaseback agreement, causing Plaintiffs $250,000 in damages; (3) Plaintiffs breached the 1994 loan contract with Defendant Joseph Chu, causing $1 million in damages; and (4) Plaintiffs breached the 1994 lease with GBI, but GBI did not incur any damages as a result of the breach. *See Uni-Rty Corp. v. Guangdong Bldg., Inc.*, No. 95 CV 09432 (GBD), 2012 U.S. Dist. LEXIS 72901, at *3 (S.D.N.Y. May 25, 2012); *see also* JA__ (Dkt. 260, Ex. A (special verdict form)).

Defendants again moved for judgment as a matter of law under Rule 50 or, in the alternative, a new trial under Rule 59. The district court denied the motions. *See* 2012 U.S. Dist. LEXIS 72901, at *27. The court explained that there was evidence that NYGF breached the provisions of the JVA. NYGF had agreed to "'devote such time and effort as [it] deem[ed] necessary to promote adequately the interest of the venture and the mutual interest of the venturers'" and it had received consideration for "'future help in the development of a hotel on the Property.'" *Id.* at *11 (alterations in original) (citations omitted). In violation of those promises,

NYGF—through the actions of Joseph and Alexander Chu—"intentionally engaged in conduct that interfered with the development and that was contrary to the best interest of the Property." *Id.* at *12.

The court pointed to trial testimony that established Defendants "instruct[ed] tenants to not pay rent to Plaintiffs," "arbitrarily refus[ed] to approve lucrative lease opportunity and other new tenants," "engag[ed] in secret negotiations to extend the 1990 HSBC mortgage loan" one day before executing the 1994 Transaction, and "refus[ed] to cooperate and assist Plaintiffs, even in renovating the Property so that Plaintiffs could obtain full occupancy." *Id.* That conduct, the court explained, "significantly harmed the financial viability of the Property," so that Plaintiffs could not satisfy their obligations under the 1994 Transaction or exercise their option to repurchase the Property. *Id.*

The court noted that Defendants presented evidence that Plaintiffs lacked the financial resources to save the Property, but, the court explained, NYGF's breach of the JVA harmed the *financial success of the Property*, so "the jury could have rationally concluded that Defendants' evidence did not demonstrate that the Plaintiff's loss of the Property was inevitable—that is, that the loss would have occurred absent [Defendants' misconduct]." *Id.* at *13 n.4. In so concluding, the court pointed to trial testimony that Plaintiffs "had finished the renovations and fully rented the Property by July 2005" and "had enough revenue to support the

-28-

mortgage payments and other obligations," and that Plaintiffs' tenants remained in the Property after Defendants took control. *Id.*

The court also upheld the jury's verdict finding Defendants liable for fraudulently inducing Plaintiffs to enter the 1994 Transaction. The court explained that the evidence showed that Defendants "secretly planned to take over the Property and its business," that Plaintiffs had "become dependent upon the Chu Defendants for financing assistance," that Defendants "repeatedly misrepresented that HSBC threatened to foreclose on the Property" during the 1994 negotiations, and that Defendants "also lied to Plaintiffs about having secured a new lender in China that required, as a condition of the loan, Plaintiffs to give the deed of the Property to Defendant Joseph Chu." *Id.* at *17-18. The court further concluded that loss of the building "was not only natural and probable in light of Defendants' misrepresentations, but also desired by Defendants." *Id.* at *18.

### *2012 Motions For Prejudgment Interest And Amended Judgment*

The district court entered judgment on May 25, 2012. SPA-6. Plaintiffs filed a timely motion under Rule 59(e) on June 20, 2012, seeking to amend the judgment to add prejudgment interest pursuant to N.Y.C.P.L.R. § 5001(a). Dkt. 248. Fifty days after judgment was entered (and after the time for filing a Rule 59 motion had lapsed), Defendants moved pursuant to Rule 60 to add prejudgment interest on their award. Dkt. 258. The district court granted both motions for

prejudgment interest, and entered an amended judgment reflecting the interest awards. *See Uni-Rty Corp. v. Guangdong Bldg. Fin., Inc.*, No. 95 Civ. 9432 (GBD), 2013 U.S. Dist. LEXIS 6033 (S.D.N.Y. Jan. 11, 2013).

## SUMMARY OF THE ARGUMENT

In response to Defendants' cross-appeal, Plaintiffs will explain why the jury verdict for Plaintiffs on their state-law claims is unassailable and amply supported by the evidence. This appeal addresses the district court's dismissal of Plaintiffs' RICO claims and grant of prejudgment interest to Defendant Joseph Chu.

I. The district court erred in dismissing Plaintiffs' RICO claims on summary judgment—notwithstanding that a jury had previously found in favor of Plaintiffs on causation during the first trial. The evidence overwhelmingly establishes that Defendants engaged in a series of fraudulent and deceitful acts—including the RICO predicate acts of mail and wire fraud and extortion—to interfere with Plaintiffs' efforts to improve and manage the Property and to acquire the Property. Plaintiffs' position is that this pattern of fraudulent and deceitful conduct violated RICO—and it did. But the question for this Court here is whether the district court properly held that there was not even a triable issue on the highly fact-dependent issue of whether those RICO violations caused Plaintiffs' injuries.

The district court erred in concluding that the evidence was insufficient to create a disputed issue of material fact on the question whether Defendants' pattern

of racketeering caused Plaintiffs to lose the building. The evidence overwhelmingly shows that Defendants' fraudulent scheme was intended to seize control of the building from Plaintiffs. And it worked. The court erred in concluding that the only plausible conclusion was that Plaintiffs lost the building for reasons unrelated to the financially debilitating impact of Defendants' pattern of racketeering. Moreover, the court simply failed to consider that if Plaintiffs had not entered into the 1994 Transaction to begin with, they could have retained the Property through means other than by exercising the 1994 repurchase option.

Furthermore, the district court failed to consider how Plaintiffs were injured *other than* the loss of the building. It is well-established that financial loss is an actionable injury under RICO, and Plaintiffs sought damages for injury to their business as well as their property. There is ample evidence that Defendants' campaign of fraudulent conduct caused lost rent from current tenants and lost leases from potential tenants, and caused Plaintiffs to incur significant transaction costs in connection with the agreements that Defendants fraudulently obtained and sought to frustrate. These injuries alone are serious. At a minimum, the evidence was sufficient to establish a triable issue on RICO causation as to these injuries.

Because they are inherently fact-dependent, causation issues are typically reserved for a jury. In this factually complex case, a jury actually entered a verdict for plaintiffs on causation in the initial 2004 trial. After the grant of a new trial,

Plaintiffs presented even *more* evidence at summary judgment in support of their claim that they were injured by Defendants' RICO violations. The district court erred when it took the surprising—and unwarranted—step of holding that there was not even a triable issue of fact on RICO causation.

II. The district court also erred in granting Defendant Joseph Chu's Rule 60 motion for prejudgment interest on his judgment against Plaintiffs. Defendant failed timely to seek prejudgment interest pursuant to Rule 59. The district court erred in holding that Defendant could cure that failure simply by seeking prejudgment interest pursuant to Rule 60. Rule 60(a) does not authorize the award of prejudgment interest here, because—under this Court's precedents—Defendant's motion did not seek correction of a clerical error. And Rule 60(b) does not work either, because none of the extraordinary factors listed therein covers the situation here—which presumably explains why neither Defendant nor the district court identified a Rule 60(b) factor on point.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment *de novo*. *See, e.g.*, *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 46 (2d Cir. 2007). On summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995); *see also Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88,

90 (2d Cir. 2010). Summary judgment is appropriate only when "'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen*, 64 F.3d at 79 (citation omitted). And "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This Court reviews the grant of a Rule 60 motion for an abuse of discretion. *See, e.g.*, *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1140 (2d Cir. 1994). A court abuses it discretion when "(1) its decision rests on an error of law or a clearly erroneous factual finding; or (2) cannot be found within the range of permissible decisions." *Johnson ex rel. United States v. University of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir. 2011).

## ARGUMENT

## I.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' RICO CLAIMS

RICO "provides a private cause of action for '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter.'" *Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 987 (2010) (quoting 18 U.S.C. § 1964(c)). To prevail on a RICO claim, a plaintiff must establish that the defendant's conduct violated § 1962 by injuring its "business or property," and that the injury was "by reason" of—*i.e.*, caused by—the violation. *See, e.g.*, *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010). To establish

causation, the plaintiff must show that the RICO violation was both the "but for" cause and the "proximate cause" of his injury. *Hemi Grp.*, 130 S. Ct. at 989. For RICO purposes, proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (citation omitted).

In seeking summary judgment, Defendants focused on proximate causation. The issue of proximate cause is invariably fact intensive and, thus, usually reserved for a jury. *See Nye v. CSX Transp., Inc.*, 437 F.3d 556, 564 (6th Cir. 2006) ("The issue of proximate cause usually is a question of fact."); *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 821 (8th Cir. 2010) ("Generally, proximate cause is a question of fact for the jury."); *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1154 (9th Cir. 2002) (noting the "fact-intensive nature of the causation question"); *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884-85 (3d Cir. 2000) ("Whether the plaintiff has proven causation is usually reserved for the trier of fact.") (reversing dismissal of complaint). Causation is, at a minimum, a disputed issue of material fact in this complex case too.

The district court held that Defendants were entitled to summary judgment on Plaintiffs' RICO claims based on its view that it was beyond doubt that Plaintiffs would have lost the building regardless of Defendants' campaign of racketeering conduct, such that RICO causation was lacking as a matter of law. 464 F. Supp. 2d at 230-31. That decision is erroneous and should be set aside.

**A.    The District Court's Summary Judgment Ruling Upsets Well-Settled "Law Of The Case" Principles**

At the outset, it must be noted that the district court's 2006 summary judgment ruling upsets "the salutary policy of finality that is the basis of the law of the case rule." *United States v. Fernandez,* 506 F.2d 1200, 1204 (2d Cir. 1974). The "law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *De Johnson v. Holder,* 564 F.3d 95, 99 (2d Cir. 2009) (citation omitted). Such "cogent" or "compelling" reasons include "an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" *Id.* at 100 (citation omitted). Here, the district court's summary judgment ruling for Defendants on RICO is in direct contravention of the court's prior denial of Defendants' JMOL motion and denial of Defendants' earlier summary judgment motions. And the district court failed to identify any "cogent" or "compelling" reason—and there is none—justifying that ruling.

The standard for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250; *see also Kerman v. City of New York*, 374 F.3d 93, 118 (2d Cir. 2004). In denying

Defendants' JMOL motion after the 2004 trial, the district court rejected Defendants' argument that there was no evidence supporting the jury's verdict, pointing to Theresa Shieh's trial testimony and concluding that the jury could find that Plaintiffs' "ability to comply with the sale leaseback agreement . . . was seriously impaired by defendants' conduct. JA__-__ (Dkt. 127 at 1-2).

To be sure, Judges may reconsider their own decisions. *Cf. Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996). But, to serve the interest of finality protected by the "law of the case" doctrine, this Court obligates a trial court to supply a "cogent" or "compelling" reason for doing so. *De Johnson,* 564 F.3d at 99; *see Sagendorf-Teal*, 100 F.3d at 277 ("Among the major grounds justifying such a reconsideration is the availability of new evidence."). Here, the district court did not identify any such reason. And there is none. There was no intervening change in law. The only new evidence was the additional deposition testimony of Dr. Chuang and Theresa Shieh, which only *bolstered* the district court's prior rulings that the evidence was at least sufficient to require a trial. And whatever else may be said about when the evidence crossed the hazy line between a material and non-material issue of fact, it cannot be said that the district court's summary judgment ruling was necessary to "'correct a clear error or prevent manifest injustice.'" *De Johnson,* 564 F.3d at 99-100 (citation omitted).

At a minimum, the district court's ruling denying Defendants' JMOL motion—not to mention the jury's verdict in favor of Plaintiffs on the causation issue and the court's two previous denials of summary judgment on causation—without identifying any change in the law or new evidence *supporting Defendants* makes the court's later decision to grant summary judgment for Defendants on the causation issue and foreclose a second trial unusual and inherently suspect. And as explained next, even putting aside the "law of the case," the district court's summary judgment ruling cannot stand for several independent reasons.

## B.  The District Court Erred In Concluding That There Was Not A Genuine Issue Of Material Fact On RICO Causation

As this Court has observed, "[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit." *Redd v. New York State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012); *accord Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 151 (2d Cir. 2009). Here, it is, at the least, "arguable" in light of the evidence presented by Plaintiffs that Plaintiffs lost the Property as a result of Defendants' RICO violations, especially when the evidence is construed in the light most favorable to Plaintiffs. Moreover, Plaintiffs were injured in their business as well as their property. The district court's ruling is based on a misunderstanding of the record and the numerous ways in which Defendants' pattern of racketeering—which was specifically designed to take the building from Plaintiffs—injured Plaintiffs.

-37-

1.    **The Evidence Is Sufficient To Create A Triable Issue On Whether Defendants' RICO Violations Prevented Plaintiffs From Exercising The Repurchase Option**

Defendants' conduct directly impacted Plaintiffs' financial wherewithal to exercise the repurchase option in the 1994 Transaction.  At the 2004 trial, Plaintiffs presented evidence that Defendants refused to allow lucrative tenants to lease the Property.  At trial, Theresa Shieh testified that Off Track Betting spoke with her about renting multiple floors of the Property, and she asked Chu about whether they could lease the space.  JA__-__ (Tr. 322:4-323:3).  In response, Chu said: "Why should I help you.  I get no benefit from this transaction."  JA__ (*id*. at 323:10-11).  She provided even more detail at her 2005 deposition, testifying  that Off Track Betting needed a new location in Chinatown with a large open space and a liquor license, and the Property—with 14,000 square feet—was the only suitable space.  JA__-__, __-__ (Shieh Dep. at 157:17-159:21, 166:7-167:24).  She showed the broker the space and had multiple conversations with him.  JA__-__ (*id.* at 167:19-168:2).  Plaintiffs would have received rent for the property and would have provided the food and drink concessions.  JA__ (*id.* at 159:12-21).

At the time, she "was so happy" and "saw this as lifesaving" for Plaintiffs.  JA__-__ (*id.* at 159:12-160:11).  She then told Chu that this was Plaintiffs' "life sa[v]er, and with this lease we can borrow money and then all the debt, all the problem we have would be gone, all the headache would be gone."  JA__ (*id.* at

-38-

160:4-11).  She gave Chu the name of the person who contacted her and suddenly the negotiations ended.  JA__ (*id.* at 160:12-17).  The broker told her that Chu was the owner of the Property and "he is not going to approve this deal, so they don't have to waste the time with us because we don't own this property, we cannot make any decisions."  JA__-__ (*id.* at 160:20-161:3).  She was "so upset" that she "went to see" Chu and pleaded with him for an hour because they were supposed to be partners in the joint venture, explaining that she previously had Off Track Betting as a tenant and it always paid the rent on time and the lease could be the basis to borrow money.  JA__-__ (*id.* at 161:4-163:7).  But Chu refused, saying that "he get[s] no benefit from this deal at all" and then smiled.  JA__ (*id.* at 161:14-17).  Dr. Chuang's 2005 deposition testimony confirmed this account of events.  *See also* JA__-__ (Chuang Dep. at 109:22-114:3).

Plaintiffs also submitted as evidence the fax proposal from the broker, which stated the base rent would be $35 per square foot for 14,000 square feet, and they submitted a calculation of the expected income from Off Track Betting's lease, which totaled over $8 million for ten years.  *See* JA__-__ (Shieh Aff. Ex. 2 at 3-4).

In addition to the Off Track Betting revenue, Plaintiffs presented evidence that—but for Defendants' conduct—they would have received additional revenue from existing tenants, which would have helped them to satisfy their loan obligations and exercise the repurchase option.  By the summer of 1995, when

Defendants took control, the Property was fully renovated and occupied.  JA__-__, __ (Tr. 259:10-21, 326:23-25).  But Chu told the tenants to stop paying rent in April 1995.  He lied to tenants and told them there was a lawsuit between Plaintiffs and Defendants—when no lawsuit had been filed.  JA__ (Tr. 328:6-18).  At trial, Shieh testified that "[a]pproximately 50 percent" of the tenants stopped paying rent.  JA__ (*id.* at 327:10-13).  During her subsequent deposition, she provided even more detail and explained that Chu told tenants who occupied booths in the Jewelry Exchange and Fei Dar Bakery to stop paying rent and that he would not renew their leases.  JA__-__, __-__ (Shieh Dep. at 49:18-116:15, 132:7-133:18).

Dr. Chuang also testified in his 2005 deposition about Defendants' interference with the Jewelry Exchange and Fei Dar Bakery.  He testified that he could not renew leases for tenants in the Jewelry Exchange because Chu refused to renew the leases.  JA__-__ (Chuang Dep. at 50:24-59:16).  He also testified that the Fei Dar Bakery—which was closely related to the Chu family—refused to pay rent in late 1994 or 1995.  *See* JA__-__ (*id.* at 10:5-38:21).  Both Shieh and Dr. Chuang also testified about other tenants as well.  Shieh testified that Defendant Joseph Chu pressured Plaintiffs to reduce the rent from the lease with Dosanko, not to take Dosanko to landlord tenant court, and to transfer the lease to Salon 189.  JA__-__ (Shieh Dep. at 142:16-157:12).  Dr. Chuang testified that Chu told Salon 189 not to pay rent.  JA __ (Chuang Dep. at 102:14-24).

Plaintiffs also presented evidence that they had fully renovated the Property, JA__ (Tr. 259:10-21), and tried to sell the Property in 1995. Defendants thwarted Plaintiffs' efforts. When Theresa Shieh tried to list the Property for sale, she could not because Chu had already used the same broker to list it. JA__-__ (*id.* at 323:12-324:6). If Plaintiffs had not succumbed to Defendants' fraud and believed that Defendants were acting in their best interests, they would have pursued the sale through another broker or sought alternative financing.

In granting summary judgment, the district court dismissed the evidence that Chu blocked Off Track Betting as a potential tenant on the ground that such a lease would not have provided ample capital to repurchase the building. But the court did not discuss whether the revenue from Off Track Betting *plus* the revenue from the current tenants with whom Defendants interfered would be sufficient to meet the loan requirements. Moreover, rental income is itself a critical factor in valuing property; so this income would have made the property more attractive for refinancing. And at the very least, a lease with Off Track Betting would have given Plaintiffs more time to operate the Property and seek additional financing.

The court dismissed the evidence concerning the lucrative Off Track Betting lease as conjectural, but this was an issue for a jury. Shieh testified that Off Track Betting had been her tenant before and always paid the rent on time. *See supra* at 39. That sort of stable revenue is precisely the sort of funding that Plaintiffs could

use as the basis for a loan.  It is completely backwards to require evidence of alternative financing when Plaintiffs did not seek alternative financing precisely because they were relying on Defendants to provide financing.  And Defendants' own actions prevented Plaintiffs from putting themselves in a position—*e.g.,* by ensuring that existing tenants paid rents, signing up lucrative new tenants, and completing renovations on the building—to secure additional financing.

The conclusion that the district court (Sprizzo, J.) erred in granting summary judgment on this issue is further underscored by the fact that Judge Daniels, in upholding the jury verdict on the state-law claims, found that a rational jury could have found that Defendants failed to show that the loss of the Property was "inevitable."  2012 U.S. Dist. LEXIS 72901, at *13 n.4.  The district court erred in taking the fact issue of causation from the jury on the RICO claims.

> ### 2.    The Evidence Is Sufficient To Create A Triable Issue On Whether Defendants' RICO Violations Prevented Plaintiffs From Retaining The Property Through Other Means

The district court further erred by considering only whether Defendants' RICO violations caused Plaintiffs failure to repurchase the Property *after* the 1994 Transaction.  Plaintiffs presented another theory of causation.  If Defendants had not engaged in the RICO predicate acts, Plaintiffs would never have entered the 1994 Transaction to begin with.  Instead of deeding the property to GBI, Plaintiffs would have retained the title.  It is true that the Property was heavily mortgaged

pursuant to the 1990 loans and Plaintiffs were in default of those loans at the time, but that does not mean that they would have necessarily lost the Property or that they had no interest in the Property at that time. To the contrary, Plaintiffs presented evidence that they would not have lost the Property because neither HSBC nor NYGF was going to foreclose on the Property in late 1993 or early 1994—even though Defendants fraudulently told Plaintiffs they would.

Plaintiffs presented evidence that HSBC "rejected" Defendants' request to jointly foreclose on the Property. JA__ (Tr. 286:23-25). Instead, HSBC told Chu that it was going to pursue his personal guaranty. JA__-__, __, __ (*id.* 308:18-24, 310:2-7). Eventually, HSBC extended its loan to Chu regarding the Property for three years. JA__-__, __-__ (*id.* at 289:20-290:4); JA__ (PX 240 at 3). Meantime, Chu was telling Plaintiffs HSBC was going to foreclose. JA__ (Tr. 310:8-9).

Plaintiffs also presented evidence that NYGF would not have foreclosed. At trial, Colombini testified that NYGF would have been in default of its loan from HSBC if it had foreclosed without HSBC's permission, JA__ (Tr. 286:19-287:25), and the December 1993 Commitment Letter confirmed that NYGF could not foreclose unless it had HSBC's written permission, JA__ (PX 240 ¶(j)); JA__-__ (Tr. 280:1-4, 289:10-16). The history also shows that NYGF would not have foreclosed because Plaintiffs were in default of their loans for years, but NYGF had never foreclosed. Instead, NYGF tried to convince HSBC to foreclose and

then simply resorted to falsely telling Plaintiffs that HSBC was going to foreclose when HSBC in fact had refused to foreclose.  JA__ (Tr. 130:11-15).

This evidence supports the conclusion that Plaintiffs would have retained the Property if they had not entered into the 1994 Transaction.  That the Property was heavily mortgaged does not mean that Plaintiffs had no remaining interest in the property.  If it did, then wrongdoers would be free to lie, cheat, and steal whenever leveraged property is at issue.  Plaintiffs—like other borrowers—were free to take a long-term view and seek to get ahead on their mortgages by ensuring that rents were paid and seeking to bring in new tenants, and to seek additional refinancing.  Plaintiffs were by no means the only commercial property owners who were heavily mortgaged during this period.  Numerous other property owners were able to climb their way out of this situation—indeed, Defendants' own expert testified at trial that the appraised value of the Property was "trending up" with the market generally by 1997.  JA__-__ (Tr. 411:12-412:12).  But other owners did not have to do it while their putative joint venture partners and others were engaged in racketeering activities designed to *prevent* them from succeeding.

Plaintiffs presented compelling evidence that Defendants' racketeering conduct contributed to the pre-1994 default.  At trial, for example, Theresa Shieh testified that Defendants interfered with prospective tenants before the 1994 Transaction.  Specifically, she testified that when she asked Joseph Chu about the

prospective tenant Fernando's (a well-known jeweler), he told her that they could not lease space in the Property because they wanted a 15-year lease.  JA__-__ (*id*. at 318:8-321:13).  Instead, Chu leased space to Fernando's in his *own* building across the street.  *Id.*  Similarly, she testified that she told Chu that Manhattan Optical was interested in a lease in the Property.  JA__-__ (*id.* at 321:17-322:3).  Instead, Manhattan Optical leased space in *Chu's* building.  *Id.*

In her 2005 deposition (after the district court granted a new trial), Shieh provided even more detail, including that the Manhattan Optical property was left vacant for three years.  *See* JA__-__ (Shieh Dep. at 183:23-206:6).  She testified that in 1992, the Vegetarian Restaurant wanted to leave Chu's building because part of the building had collapsed due to an issue with the gas pipe.  JA__ (*id.* at 206:7-25).  The restaurant was interested in two units on the second floor of the Property—and even made a $3,000 deposit—but Chu induced them to stay in his property.  JA__-__ (*id.* at 206:22-211:16).  She also testified that Prudential Insurance Company was interested in leasing up to 6,000 square feet in the Property and she quoted a price of $50 to $55 per square foot.  JA__-__ (*id.* at 173:20-175:12).  But once Chu's broker "stepped in the deal is gone, and I have no idea what happened between them."  JA__-__ (*id.* at 182:19-21).

According to Shieh, "[t]hey asked me to bring all the people interested [in becoming tenants] to them because  … [Defendants' broker] knows how to make a

deal. But whatever I bring to him, the deal is gone. In the past few years he never bring one tenant in the building, and whoever I bring to him the deal is gone." JA__-__ (*id.* at 181:25-182:8); *see also* JA__-__ (Chuang Dep. at 115:10-118:5) (Prudential)). She also quantified the pre-1994 lease interference, which totaled $1.2 million in lost rent. JA__ (Shieh Aff. Ex. 3). The new deposition testimony thus had provided evidence "quantifying" the losses that the district court had found lacking when it granted a new trial. JA__ (Dkt. 127 at 2).

In addition, Plaintiffs also presented evidence at the 2004 trial and on summary judgment in 2006 that they would have sought other financing but for Defendants' fraudulent and deceitful conduct. For example, Joseph Chu himself presented Theresa Shieh a proposal for developing the Property into condominiums. According to his own estimates, the Property would have a value of $24 million and the renovation would cost only $2 million. JA__-__ (Tr. 325:4-326:11). Similarly, GBI's sale of one half of the equity in the Property to NYGF for $6.5 million, JA__ (JSX 33), indicates that Defendants thought the equity of the Property was worth $13 million, when it was also encumbered with $13 million in debt. But Plaintiffs did not pursue the condominium proposal or other financing because they were relying on Defendants to secure financing, in accordance with the JVA and Defendants' representations. JA__-__ (Tr. 328:24-330:18). But

instead of acting as joint venture partners, Defendants were engaged in a pattern of racketeering activity designed to crush Plaintiffs' property and business.

In granting summary judgment for Defendants, the district court failed to address all of this evidence that Defendants' RICO violations forced Plaintiffs into entering the 1994 Transaction. There is, at a minimum, a material issue of disputed fact that, but for Defendants' pattern of racketeering, Plaintiffs would have retained the mortgaged Property, rented it to additional tenants, secured at least $1 million in lost rents, and secured alternative financing as property values rose. Under Rule 56 and this Court's precedent, a jury was required to review the evidence and resolve that disputed issue of material fact.

### 3. The Evidence Is Sufficient To Create A Triable Issue On Whether Defendants' RICO Violations Injured Plaintiffs In Ways Other Than The Loss Of The Property

Even putting aside the loss of the building, the district court also erred by failing to address whether Defendants' RICO violations caused injuries *other* than the complete loss of the Property. Loss of a building is not an element of a RICO claim. The RICO statute broadly provides a civil remedy for any person "injured in his *business or property*" by a violation of § 1962. 18 U.S.C. § 1964(c) (emphasis added). It is well-settled that financial losses of a business are actionable injuries under RICO—it is not limited to physical loss of a building. *See*, *e.g.*, *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008)

("[T]he defrauded plaintiff may recover out-of-pocket losses caused by the fraud." (internal quotation marks and citation omitted); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999) (insurance premiums and foregone returns of an alternative investment account are sufficient to confer RICO standing); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir. 1994) (lost profits from potential construction contracts are compensable); *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 104-05 (2d Cir. 1993) (expenditures and expenses regarding transaction are sufficient to confer RICO standing).

Plaintiffs' RICO injuries were not limited to the loss of the building. For example, Plaintiffs specifically alleged that they never would have poured "hundreds of thousands of dollars in renovating the Property" or "gone through with the 1994 Closing" if they had known of Defendants' illegal scheme. JA__-__ (Dkt. 46 ¶105); *see* JA__, __, __ (*id.* ¶¶110, 113, 116, 128 (incorporating ¶105 by reference)). And the district court itself recognized at the 2004 trial that a jury could find "some other injury" than the loss of the building. JA__ (Tr. 478:11-15). Yet, inexplicably, in its 2006 summary judgment ruling, the court failed to address any financial injuries other than the loss of the building.

The evidence overwhelmingly establishes that, wholly apart from the loss of the Property, Plaintiffs suffered financial injuries as a direct result of Defendants'

pattern of fraudulent and deceitful conduct. Plaintiffs presented evidence at the 2004 trial and through the 2005 depositions that Defendants' RICO violations led to lost rent by current tenants and lost rent from prospective tenants—both before and after the 1994 Transaction. *See supra* at 38-47. This lost business and related revenue directly impacted Plaintiffs' management of the property, and thus the revenues they were able to generate from the Property, as well as the value of the Property and the bottom line of the Plaintiffs' personal liabilities in connection with the management of the Property. For example, Plaintiffs presented evidence that they lost $1.2 million from the prospective leases with Prudential Insurance, Fernando's Jewelry, Manhattan Optical, and the Vegetarian Restaurant, and over $600,000 in the first year alone from Off Track Betting.

The district court (improperly) concluded that these lost business opportunities and revenues did not cause Plaintiffs' *loss of the Property* because the amount of these losses purportedly was not sufficient to enable Plaintiffs to meet their obligations under the 1994 Transaction and exercise the repurchase option. But the court completely failed to consider whether Defendants' RICO violations caused these separate injuries—which are themselves actionable under §1964(c). And there is no serious question that it did.

Plaintiffs also paid substantial amounts as expenses in connections with the various loan agreements they entered as a result of Defendants' RICO violations.

-49-

*See, e.g.*, JA__ (JPTO ¶21 (Plaintiffs paid $200,000 to Joseph Chu as a conveyance fee and $60,000 as a loan fee in conjunction with the 1994 Transaction)). Incurring these expenses injured to Plaintiffs, and the district court failed to consider whether Defendants' RICO violations caused these injuries. Even assuming (against the weight of the evidence) that Plaintiffs never had a chance to reacquire *the building*, Plaintiffs were injured by Defendants' fraudulent and deceitful conduct because if Plaintiffs' had known that Defendants were secretly undercutting their efforts to manage the building, Plaintiffs could have cut their losses instead of continuing to pour money into the Property—and down the drain.

At a minimum, the Court should vacate the district court's grant of summary judgment and remand the case for a jury to consider whether Defendants' pattern of racketeering caused these other financial losses.

## C. Allowing The RICO Claims To Proceed To Trial Is Consistent With The Purposes Of RICO's Proximate-Cause Limitation

This case does not implicate any of the concerns that the Supreme Court has identified in its RICO cases. The Court has held that RICO proximate causation may be non-existent where there would be difficulty in ascertaining damages, there is a risk of duplicative recovery, there are more direct victims, and where there is a potential to blur the line between RICO and the antitrust laws in suits by economic competitors. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-60 (2006); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).

None of those concerns apply here. Plaintiffs are the direct victims of Defendants' decade-long campaign of racketeering activity. Plaintiffs not only lost their prized property, but were directly injured in their business and personal fortunes by virtue of the substantial rent and potential tenants that they lost due to Defendants' pattern of racketeering, and by virtue of the hundreds of thousands of dollars that they poured into the building in renovations and transaction costs they incurred because they were not aware of Defendants' fraudulent scheme. There is thus no risk of duplicative recovery, there are no more direct victims, and these injuries were the foreseeable—and indeed the *intended*—result of Defendants' actions. This case also does not involve a competitive injury, so it does not implicate the potential overlap between RICO and the antitrust laws.

Nor is this a case where it is difficult to "trace[] the alleged violation to the injury." *Uni-Rty Corp.*, 464 F. Supp. 2d at 230. Defendants launched their pattern of racketeering activity to seize control of the Property. And ultimately, they did just that. Along the way, Plaintiffs not only lost ownership of a coveted commercial property, but were seriously injured in their business of operating that property. There is, in other words, a direct correlation between the RICO violations and the alleged injuries. In reaching the contrary conclusion, the district court simply failed properly to weigh the evidence and did not even consider the injury to Plaintiffs' business interests as a result of Defendants' RICO scheme.

-51-

The purposes of RICO—a statute that "shall be liberally construed to effectuate its remedial purposes," Pub. L. No. 91-452, tit. IX, § 904, 84 Stat. 922, 947 (1970); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009)—would be directly served by allowing Plaintiffs' claims to proceed to a trial. And, as discussed, the evidence that Defendants were injured in their "business and property" by RICO violations is more than sufficient to create (at the least) a material issue of dispute fact on causation for a jury, not a court.

## II.  THE DISTRICT COURT ERRED IN GRANTING DEFENDANT'S RULE 60 MOTION FOR PREJUDGMENT INTEREST

The district court also erred in granting Defendant Joseph Chu's Rule 60 motion for prejudgment interest on the damages that he was awarded for breach of contract. Defendant waited too long to move for prejudgment interest under Rule 59, as Plaintiffs timely did. So instead, Defendant turned to Rule 60. But Rule 60 is an improper vehicle for the prejudgment interest requested here.

Defendant did not specify whether he sought relief under Rule 60(a) or (b) but instead simply referred generally to Rule 60. *See* JA__ (Dkt. 256 at 14 n.11) ("pursuant to FRCP 60"); JA__ (Dkt. 258 at 2) ("pursuant to Rule 60"). The district court appeared to treat the motion as one for relief under Rule 60(a), stating: "Rule 60(a) is a proper vehicle through which to bring a motion to amend a judgment to add prejudgment interest 'where the judgment has failed to include an amount of interest that the governing law requires to be automatically

considered.'"  2013 U.S. Dist. LEXIS 6033, at *10 (quoting *In re Frigitemp Corp.*, 781 F.2d 324, 327 (2d Cir. 1986)).  But the court's reliance on Rule 60(a) was misplaced.

Rule 60(a) provides in pertinent part:  "The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." [5]  A motion for prejudgment interest generally alters the substantive rights of the parties, rather than correcting a clerical error.  This Court has made clear that a Rule 60(a) motion for prejudgment interest is permissible only in two limited circumstances:  (1) "where the judgment has failed accurately to reflect the actual decision of the decision-maker to award such interest," or (2) "where the judgment has failed to include an amount of interest that the governing law requires to be automatically included in the judgment."  *In re Frigitemp Corp.*, 781 F.2d at 327.  Neither circumstance is present here.

The district court did not rely on the first circumstance and it plainly does not apply.  Instead, the district court relied on the second circumstance, stating that N.Y.C.P.L.R. § 5001(a) "requires that interest be added to any recovery for breach of contract."  2013 U.S. Dist. LEXIS 6033, at *10.  But in *Lee v. Joseph E. Seagram & Sons, Inc.*, 592 F.2d 39 (2d Cir. 1979), this Court has flatly rejected

---

[5]  The text of Rule 60 was amended in 2007, but the changes were "stylistic only."  Fed. R. Civ. P. 60 advisory committee's note (2007).

-53-

that reasoning.  There, the Court held that prejudgment interest that, by state law (N.Y.C.P.L.R. § 5002), must *automatically* be added to the judgment by a clerk may be addressed through a Rule 60(a) motion because that "falls within the . . . meaning of 'clerical error.'"  *Id.* at 41-42.  But the fact that a party has failed to pursue a "statutory entitlement" to interest does not create "any clerical oversight or error" that may be addressed under Rule 60(a).  *Id.* at 42.  Accordingly, in *Lee*, the Court held that a party could not invoke Rule 60(a) to obtain prejudgment interest under N.Y.C.P.L.R. § 5001(a)—the same provision at issue here—since that provision lacks the *automatic* trigger in N.Y.C.P.L.R. § 5002.

The Court reaffirmed this principle in *Paddington Partners v. Bouchard*, 34 F.3d 1132 (2d Cir. 1994).  There, the Court held that the award of "*post*-decision interest" was proper because the error was ministerial since N.Y.C.P.L.R. § 5002—the state-law provision under which interest was sought—"requires the clerk of the court *automatically* to calculate interest from the date of the decision awarding damages to the date of entry of judgment, and to add this amount to the judgment."  *Id.* at 1141 (emphasis added).  By contrast, "[t]he absence of an award of *pre*-decision interest in the original Judgments was not a clerical error within the terms of Rule 60(a), because it could not be corrected without a finding of fact regarding the dates from which such interest should run."  *Id.* (emphasis added).

The same is true here.  The district court admitted that the "jury did not fix a date that Plaintiffs' breach occurred."  2013 U.S. Dist. LEXIS 6033, at *10 n.4.  The court rejected Defendant's proposed date—June 1, 1995, when Plaintiffs missed their first payment—because Defendant was not entitled to interest on the fully amount of the judgment from the date of the first missed payment.  *Id.*  Instead, the court found "a reasonable intermediate date to be the date this action commenced, November 6, 1995."  *Id.*  Accordingly, Defendant's claim to pre-verdict interest was not properly the subject of a Rule 60(a) motion to correct a "clerical error."  The district court's decision "rests on an error of law" and thus is an abuse of discretion.  *University of Rochester Med. Ctr.*, 642 F.3d at 125.

Defendant has waived any argument that he is entitled to prejudgment interest under Rule 60(b) by failing even to attempt to explain below why any of the extraordinary circumstances listed in Rule 60(b) is present.  *See Old Republic Ins. Co. v. Pacific Fin. Servs. of Am., Inc.,* 301 F.3d 54, 59 (2d Cir. 2002) (party waived argument for relief under Rule 60(b) factor by failing to identify precise subsection below).  But in any event, Rule 60(b) does not help Chu either.  Rule 60(b) is "a mechanism for 'extraordinary judicial relief' invoked only if the moving party demonstrates 'exceptional circumstances.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citation omitted).  Chu did not even attempt to explain how this standard could be met as to any of the Rule 60(b)

factors.  The district court in its decision likewise did not identify a single Rule 60(b) factor that supported the entry of relief here.  Nor is there any basis for finding that any of the "exceptional circumstances" is present.

Far from it.  Defendant invoked Rule 60 simply because he neglected to file a Rule 59 motion for prejudgment interest within 28 days of the entry of judgment, *see* Fed. R. Civ. P. 59(b), as Plaintiffs did.  Instead, Defendant waited 50 days after judgment, and then filed his Rule 60 motion.  If that were a sufficient basis to invoke Rule 60(b), then Rule 60 relief would always be available when a party failed to file a timely Rule 59 motion for prejudgment interest, and this Court's precedent recognizing Rule 60 as "a mechanism for 'extraordinary judicial relief'" would be a dead letter.  There is no basis for this Court to take that step.  The district court's award of prejudgment interest to Defendant for the period from November 6, 1995 until the date of the verdict therefore must be vacated.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's 2006 grant of summary judgment for Defendants on Plaintiffs' RICO claims and vacate the district court's 2013 award of prejudgment interest for Defendant Joseph Chu from November 6, 1995 until the date of the jury verdict.

Dated: April 18, 2013

Respectfully submitted,

Paul Batista, P.C.
26 Broadway
Suite 1900
New York, NY 10004
(212) 980-0070

Gregory G. Garre
Katherine I. Twomey
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

Tucker H. Byrd
MORGAN & MORGAN, P.A.
20 North Orange Ave.
Suite 1600
Orlando, FL 32801
(407) 204-9494

*Counsel for Uni-Rty Corp. and Golden Plaza Limited Partnership*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,664 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point Times New Roman font.

Dated: April 18, 2013

Gregory G. Garre

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2013, I filed the foregoing PAGE PROOF OPENING BRIEF AND SPECIAL APPENDIX OF APPELLANTS UNI-RTY CORP. AND GOLDEN PLAZA LIMITED PARTNERSHIP with the Clerk of the Court for the United States Court of Appeals for the Second Circuit.

I further certify that on April 18, 2013, true and correct copies of the foregoing were served via FedEx upon the following:

John Charles Ohman
Vandenberg & Feliu, LLP
51st Floor
60 East 42nd Street
New York, NY 10165

William J. Schwartz
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036

Gregory G. Garre