# 09-3559-cv(L),
## 12-2516-cv(XAP), 12-2536-cv(XAP), 13-0401-cv(CON)

# United States Court of Appeals
*for the*
# Second Circuit

———————————◆———————————

UNI-RTY CORP. and GOLDEN PLAZA LIMITED PARTNERSHIP,

*Plaintiffs-Counter-Defendants-Appellants-Cross-Appellees,*

– v. –

GUANGDONG BUILDING, INC., NEW YORK GUANGDONG FINANCE, INC., JOSEPH CHU and ALEX CHU,

*Defendants-Counter-Claimants-Appellees-Cross-Appellants,*

EASTBANK, N.A.,

*Defendant-Counter-Claimant-Appellee.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR DEFENDANT-APPELLEE-CROSS-APPELLANT NEW YORK GUANGDONG FINANCE, INC.

JOHN C. OHMAN
DEBRA KOBRIN LEVY
VANDENBERG & FELIU, LLP
*Attorneys for Defendant-Appellee-Cross-Appellant New York Guangdong Finance, Inc.*
60 East 42nd Street, 51st Floor
New York, New York 10165
(212) 763-6800

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, New York Guangdong Finance, Inc. states that it is not owned by any parent company and it is not a publicly owned entity.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT …………………………….. i

TABLE OF AUTHORITIES ........................................................... iv

PRELIMINARY STATEMENT …………………………………………… 1

JURISDICTIONAL STATEMENT ….................................................... 2

ISSUES TO BE PRESENTED TO THIS COURT…………………..………3

SUMMARY OF ARGUMENT..................................................... 4

SUMMARY OF FACTS............................................................. 6

    A.  The 1990 Loan................................................................ 7

    B.  The 1990 "Joint Venture Agreement"…………………………....8

    C.  Appellants' Default Under the 1990 Loan Documents…………..9

    D.  The 1994 Transactions..................................................10

    E.  Appellants' Immediate Default Under the 1994 Agreements……13

ARGUMENT .........................................................................14

    STANDARDS OF REVIEW................................................. 14

        Judgment as a Matter of Law............................................. 14

        Motion for a New Trial….................................................. 15

    POINT I..................................................................... 16

    THE DISTRICT COURT PROPERLY GRANTED SUMMARY
    JUDGMENT ON APPELLANTS' RICO CLAIMS ………………….. 16

    POINT II.………............................................................. 16

APPELLANTS FAILED TO PROVE PROXIMATE CAUSE
ON THE BREACH OF CONTRACT CLAIM...................................... 16

   A.  NYGF Did Not Cause Appellants' Loss of the Property............. 17

   B.  None of the Purported Breaches Identified by the District Court
      Caused Appellants' Damages........................................................ 20

POINT III……........................................................................................ 25

THE DAMAGES AWARD ON APPELLANTS' BREACH OF
CONTRACT CLAIM SHOULD BE SET ASIDE.……………………25

   A.  The Damages Awarded Constitute an Impermissible Windfall…25

   B.  The District Court's Justification of the Damages Award
      Was Flawed……………………..…………………………… 28

POINT IV…………………………………………………………….29

THE DISTRICT COURT ERRED IN DENYING NYGF'S
MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE
FRAUDULENT INDUCEMENT CLAIM ……………….....................29

CONCLUSION............................................................................................30

# TABLE OF AUTHORITIES

## Federal Cases

Boyce v. Soundview Tech. Group, Inc.,
464 F.3d 376 (2d Cir. 2006) ................................................................28

Brutus v. Silverseal Corp.,
439 F. App'x 28 (2d Cir. 2011) ..........................................................14

Clamyer Int'l, Inc. v. Shurtape Techs., Inc.,
No. 98 Civ. 4510, 1999 WL 1225253 (S.D.N.Y. Dec. 21, 1999) .......................15

DeFalco v. Dirie,
978 F. Supp. 491 (S.D.N.Y. 1997) ......................................................15

Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,
No. 96 Civ. 7874, 2002 WL 826956 (S.D.N.Y. May 1, 2002) ...........................17

In re Featherworks Corp.,
25 B.R. 634 (Bankr. E.D.N.Y 1982) .....................................................29

In Re: Uni-Rty Corp.,
175 F.3d 1008, 1999 WL 177273 (2d Cir. Mar. 26, 1999) .................................11

In Re: Uni-Rty Corp.,
No. 96 Civ. 4573, 1998 WL 299941 (S.D.N.Y. Jun. 9, 1998) ...........................11

Isley v. Motown Record Corp.,
69 F.R.D. 12 (S.D.N.Y. 1975) ............................................................16

Merrill Lynch Interfunding, Inc. v. Argenti,
155 F.3d 113 (2d Cir. 1998) .............................................................15

Miller v. Robertson,
266 U.S. 243 (1924).......................................................................26

National Mkt. Share, Inc. v. Sterling Nat. Bank,
392 F.3d 520 (2d Cir. 2004) .............................................................17

Point Productions A.G. v. Sony Music Entm't, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002) ...................................................17

PPX Enters., Inc. v. Fredericks,
94 F. Supp. 2d 477 (S.D.N.Y 2000) ....................................................29

R.R. Love, Ltd. v. TVT Music, Inc.,
   282 F. App'x 91 (2d Cir. 2008) ...........................................................16

Schlaifer Nance & Co. v. Estate of Warhol,
   119 F.3d 91 (2d Cir. 1997) ..................................................................15

Sharma v. Skaarup Ship Mgmt. Corp.,
   916 F.2d 820 (2d Cir. 1990) ................................................................28

The Upper Deck Co., LLC v. Breakey Int'l, BV,
   390 F. Supp. 2d 355 (S.D.N.Y. 2005) ..................................................26

Uni-Rty Corp. v. Guangdong Bldg., Inc.,
   464 F. Supp. 2d 226 (S.D.N.Y. 2006) ..................................................22

Uni-Rty Corp. v. Guangdong Bldg., Inc.,
   95 CV 9432, 2012 WL 1901200 (S.D.N.Y. May 25, 2012)........................ passim

United States v. Chuang,
   897 F.2d 646 (2d Cir. 1990) ................................................................13

Waxman v. Envipco Pick Up & Processing Svcs., Inc.,
   No. 02 Civ. 10132, 2006 WL 236818 (S.D.N.Y. Jan. 17, 2006) ........................26

**State Cases**

Rakylar v. Washington Mut. Bank,
   858 N.Y.S.2d 759 (N.Y. App. Div. 2008)..............................................26

Webster v. Di Trapano,
   494 N.Y.S.2d 550 (N.Y. App. Div. 1985)..............................................29

**Rules and Statutes**

18 U.S.C. § 1964(a) .................................................................................2

28 U.S.C. § 1291 .....................................................................................3

28 U.S.C. § 1331 .....................................................................................2

28 U.S.C. § 1367(a) .................................................................................3

Fed R. Civ. P. 50(b) ....................................................................... 3, 4, 14

Fed. R. Civ. P. 59 ..................................................................................16

**Other Authorities**

Charles Dickens, <u>Bleak House</u>, 14
(Oxford University Press 2008) (1853) ..................................................................1

## PRELIMINARY STATEMENT

Like the fictional case of _Jarndyce v. Jarndyce_ in Dickens' _Bleak House_, "[i]nnumerable children have been born into [this] cause;…innumerable old people have died out of it."[1] Yet, after nearly 18 years of litigation – including an earlier appeal to this Court in a related bankruptcy case, several dismissal and summary judgment motions and two jury trials – Appellants have never come forward with competent evidence to sustain their central claim:  that they "lost" title to the subject property as a proximate result of alleged wrongdoing by New York Guangdong Finance, Inc. ("NYGF").  This should have been the end of the matter, and this action should have been resolved in favor of NYGF and its co-defendants years ago.

But it wasn't.

Instead, one year ago the District Court denied NYGF's post-trial motion to set aside the 2009 jury verdict that awarded Appellants millions of dollars in damages on their claims for breach of contract and fraudulent inducement.  In so doing, Judge Daniels disregarded the evidence and hornbook principles of causation and damages law.  That evidence established that by 1994 Appellants would have lost title to the property irrespective of any alleged breach by NYGF because – independently of any conduct on NYGF's part – they lacked

---

[1]    Charles Dickens, Bleak House, 14 (Oxford University Press 2008) (1853).

1

the financial wherewithal to pay the taxes, debt service and other costs entailed in maintaining possession and title.  Simply, the District Court erred in rubber-stamping a verdict that was not supported by the evidence.

The court below also erred in sustaining a damages award that, Judge Daniels found, reflected the "value" of the property and compensated Appellants for this "loss."  Judge Daniels was wrong in at least two respects. First, the basis of this supposed "valuation" was the price paid by Appellants to purchase the property prior to any supposed breach, in violation of the well-settled rule that damages are to be measured at the time of the breach.  Second, that purchase price was substantially funded by loans that Appellants never repaid and, therefore, the jury's damages award put Appellants in a better position than they would have been but for the alleged breach by NYGF.

Appellants have more than had their day in court.  The 2009 trial should have disposed of their insupportable claim that NYGF caused their "loss" of the property.  Instead, the jury reached a verdict that was squarely at odds with the law and the evidence.  Because the District Court erred in sustaining that verdict, the rulings appealed from must be reversed.

## JURISDICTIONAL STATEMENT

The District Court had original jurisdiction over the federal claim in this action pursuant to 18 U.S.C. § 1964(a) and 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims asserted in this action pursuant to 28

2

U.S.C. § 1367(a). The court retained supplemental jurisdiction after dismissing the federal claims in 2006. On July 14, 2009, a jury verdict was entered for Appellants on their supplemental state-law claims. The District Court entered judgment on May 25, 2012. Uni-Rty Corp. v. Guangdong Bldg., Inc., 95 CV 9432, 2012 WL 1901200 (S.D.N.Y. May 25, 2012), Docket No. 242 (hereinafter as "Post Trial Decision"); SSA-1-7.[2] NYGF filed a Notice of Cross-Appeal on June 22, 2012. JA _ [Docket No. 253]. The District Court entered an amended judgment on January 16, 2013. JA _ [Docket No. 261]. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 over this final order.

## ISSUES TO BE PRESENTED TO THIS COURT

NYGF raises the following issues, in addition to the issues raised by Uni-Rty Corporation ("Uni-Rty") and Golden Plaza Limited Partnership ("GPLP," and collectively with Uni-Rty, "Appellants"):

1. Whether the District Court erred in denying NYGF's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial on Appellants'

---

[2] "SSA" refers to the Supplemental Special Appendix attached to the brief of Cross-Appelants Guangdong Building, Inc. ("GBI"), Joseph Chu and Alex Chu (collectively, the "Chu Appellees"). "JA" refers to the Deferred Joint Appendix. All references to the trial transcript refer to the July 2009 trial. "JSX", "PX" and "DX" refer to, respectively, the specific Jointly Stipulated Trial Exhibits from the 2009 trial, the specific Plaintiffs' Trial Exhibits from the 2009 trial, and the specific Defendants' Trial Exhibits from the 2009 trial. "JSF" refers to the Jointly Stipulated Facts from the 2009 trial.

breach of contract claim, where there was insufficient evidence that NYGF's acts were the proximate cause of Appellants' injury.

2. Whether the District Court erred in denying NYGF's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial, where the damages awarded on both the breach of contract and fraudulent inducement claims were irrational, excessive and against the weight of the evidence.

**3.** Whether the District Court erred in denying NYGF's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial, on the fraudulent inducement claim, where there was insufficient evidence that NYGF's purported misstatements or omissions were the proximate cause of Appellants' injury.

## SUMMARY OF ARGUMENT

Appellants brought this action alleging that they "lost" title to a piece of real property principally located at 239-241 Canal Street in lower Manhattan[3] (the "Property" or "the Building") as a result of culpable conduct by NYGF. But the evidence at trial failed to establish that NYGF's purportedly wrongful

---

[3]    Despite the District Court's shorthand as to the location of the Property, it is in fact comprised of three contiguous buildings located at 239-241 Canal Street, 157-201 Centre Street and 1-3 Howard Street.  JA _ [JSF ¶ 1, n.4].

actions proximately caused the damages awarded. Accordingly, the jury's verdict should have been set aside.[4]

*First*, the evidence at trial indisputably showed that Appellants lacked financial resources anywhere near what they needed to satisfy their debt obligations on the Property, and therefore would have lost the Building to foreclosure notwithstanding the alleged breach of contract by NYGF. The District Court ignored this lack of causation in denying NYGF's motion for judgment as a matter of law or for a new trial. SSA-1-7. That decision was erroneous and should be reversed.

*Second*, the jury's damages award on the breach of contract claim was irrational, excessive and manifestly against the weight of the evidence. In its Post Trial Decision, the District Court assumed that the total damages awarded on both claims was "based on the loss of the Property" and the Property's "original purchase price" of $8.5 million "paid" by Appellants in 1989. SSA-4. But the District Court failed to acknowledge that this original purchase price was *substantially funded with loans Appellants never repaid*. JA _, _, _ and _ [PX 24, 29, 39 and 104]; JA _ [DX NN]; JA _ and _ [Tr. at 424:24-25 and 1074:19-24]. It was *not* an out-of-pocket loss suffered by Appellants for which they were entitled to compensation.

---

[4]     NYGF joins in the arguments advanced in the brief submitted by the Chu Appellees in opposition to Appellants' principal appeal of the District Court's grant of summary judgment on their RICO claims.

*Third*, the District Court erred in upholding the jury's verdict on the fraudulent inducement claim, not least because Appellants failed to adduce evidence that, but for Appellees' alleged fraudulent misrepresentations or omissions, Appellants would <u>not</u> have entered into a sale/leaseback agreement with NYGF and GBI in 1994 (the "Sale Leaseback Agreement"). Absent such proof of reliance or proximate cause, the fraudulent inducement claim fails as a matter of law. Further, there is no basis in the record supporting the jury's $250,000 damages award on this claim.

## SUMMARY OF FACTS

The evidence at trial established that between 1989 and 1994 Appellants and Appellees entered into a series of transactions involving a commercial property located at 239-241 Canal Street in Manhattan's Chinatown District. JA_ [JSF ¶¶ 11-12]; JA_ and _ [JSX 1 and 2]; JA _ and _ [Tr. at 143:11-12 and 1162:12-25]; JA _ and _ [PX 29 and 96]; JA _ - _ [DX QQ and RR]. In 1989, Appellants purchased the Property from the FDIC for $8.5 million. JA _ [PX 24]. This purchase was substantially funded by a $6,025,000 purchase money mortgage loan provided by the FDIC and $1.1 million in loans provided by NYGF and Eastbank.[5] JA _, _, _ and _ [PX 24, 29, 39, 104]; JA _ [DX NN]; JA _ [Tr. at 424:24-5].

---

[5]    In addition to an $800,000 second mortgage loan provided by NYGF to Uni-Rty, Eastbank, N.A. also provided an additional $300,000 in mortgage loans, $150,000 each to

### A.    The 1990 Loan

In 1990, Appellants borrowed $10 million from NYGF ("the 1990 Loan"). JA _ [Tr. at 143:11-12]. The 1990 Loan was secured by two mortgage liens held by NYGF, one for $9 million and one for $1 million. JA _ and _ [DX QQ and RR]. To help fund the 1990 Loan, NYGF borrowed $9 million from HSBC. JA_ [JSF ¶ 13]; JA _ [Tr. at 1163:1-6]; JA _ [PX 111]. NYGF's $9 million loan from HSBC was secured by an unconditional personal guarantee from Joseph Chu and the $9 million mortgage NYGF held from Appellants, which was collaterally assigned to HSBC. JA _ [JSF ¶13]; JA _ - _, _-_ , _ - _ and _ [Tr. at 145:25-146:7, 694:22-695:1; 1126:19-1127:6; and 1163:1-6]. By its terms, the 1990 Loan was due to mature in four years, in February 1994. JA _ and _ [PX 96 and 111]; JA _ [DX RR]. In the event of default on the $1 million mortgage lien, held by NYGF, NYGF was entitled to foreclose on the Building. JA _ [DX QQ]; JA _ [PX 96].

The proceeds of the 1990 Loan were used to (a) pay off a first mortgage on the Building that was held by the FDIC, (b) pay off a second mortgage that was held by Eastbank, (c) set up a $900,000 interest reserve to cover, for a period of time, the Appellants' interest only payments to NYGF under the loan documents, and (d) provide Appellants with working capital of approximately

---

T&C Realty and Second Avenue Restaurant, two affiliate entities of Uni-Rty. Thus, although these affiliates are not parties to this action, the total amount borrowed by Plaintiffs (and their affiliates) from various Defendant entities in 1989 was $1.1 million. JA _ [Tr. at 431:18–22].

$825,000 and an additional $1 million in construction loan proceeds.  JA _ - _ [Tr. at 350:12–352:16]; JA _ , _ and _ [PX 96, 104 and 111; JA _ and _ [DX QQ and RR].   Under the loan documents, the Appellants were required to pay all real estate taxes due on the Building and to make interest only payments (at prime rate plus 2%) each month.  JA _ [PX 96]; JA _ and  _ [DX QQ and RR].  The  full  principal  balance  of  the  1990  Loan,  of  $10  million,  ballooned  at maturity in February 1994.  JA _ [PX 96]; JA _ and _ [DX QQ and RR]; JA _ [Tr.  at  167:19-22].    Thus,  as  of  1990,  the  Building  was  encumbered  with $10 million in mortgage debt.  JA _ and _ [PX 96 and 111]; JA _ and _ [DX QQ and RR].  If by February 1994 Appellants were unable to pay or refinance the 1990 loans, they would be in default and subject to foreclosure.  JA _ at 1 [PX 96 at 1]; JA _ and _ at ¶¶ 2.01 (a), (e), (q) and 2.02 (c)(2) [DX QQ and RR at ¶¶ 2.01 (a), (e), (q) and 2.02 (c)(2)]; JA _ - _; _ - _ and _. [Tr. at 812:23-814:7; 1064:24-1065:5; and 1073:6-14].

## B.    The 1990 "Joint Venture" Agreement

At  the  same  time  as  the  1990  Loan,  the  Appellants  and  NYGF  also executed a document denominated a "Joint Venture Agreement."  JA _ [PX 434] (the "1990 Agreement").  The 1990 Agreement required that NYGF use its best efforts to provide or arrange for a one-time $10 million round of financing (which  NYGF  did)  and  granted  NYGF  a  10-percent  equity  interest  in Appellants (valued for purposes of the Agreement at $2 million).  Id. at ¶¶ 3 and

8

4.  Apart from requiring NYGF to use its "best efforts" in connection with $10 million in financing, NYGF's financing obligations, and the terms governing NYGF's equity interest in Appellants, the 1990 Agreement left each of the parties free to devote such time and effort to the "venture" (or no time or effort at all) as it saw fit.  JA _ [PX 434] at ¶ 9; JA _ and _ - _ [Tr. at 960:4-16; and 1155:16-1156:5].

### C.    Appellants' Default Under the 1990 Loan Documents

As of January 1, 1994, Uni–Rty and GPLP had not satisfied their obligations to NYGF under the 1990 Loan documents, falling further into default as the maturity on those mortgages approached.  JA _ [JSF ¶ 11]; JA _ [JSX 51]; JA _ [Tr. at 1162:12-15].  Specifically, Appellants owed more than $1,200,000 in back interest and related charges to NYGF, as well as an additional $1,400,000 in unpaid real estate taxes on the Building.  JA _ [JSF ¶ 11]; JA _ [JSX 51]; JA _, _ and _ [Tr. at 156:1-4; 272:9-21; and 1162:15-18].  As of early 1994, the unpaid amounts, including delinquent interest and real estate taxes, totaled approximately $2,600,000.  JA _ [JSF ¶ 11]; JA _ [Tr. at 1162:18-20].

Moreover, the $10 million principal balance was due to mature in February 1994.  JA _ and _ [DX QQ and RR]; JA _ [Tr. at 167:19-22].  As a result, in addition to the outstanding $2.6 million in defaults, Appellants had to come up with an additional $10 million to satisfy their obligations under the

9

1990 Loan.    Appellants' already precarious financial position was only exacerbated by the fact that as a result of a real estate market collapse in the early 1990s, the Property had lost $2 million in value and was "under water." JA _ [PX 131]; JA _ - _, _ - _ and _ [Tr. at 716:25-717:6; 1059:5-9; 1059:24-1060:4; and 1067:3-11].  The evidence at trial demonstrated that Appellants had no money to pay the delinquent interest and real estate tax amounts (JA _ [Tr. at 271:21-272:8]), let alone the $10 million balloon payment, and had no alternative transaction available to them.   JA _ [JSF ¶ 11]; JA _, _ and _ [Tr. at 270:11-18; 301:13-19; and 1154:8-17].  They had made no attempt to locate alternate funding, had not submitted any loan application to any financial institution and apparently had no other plan either to cure their multi-million dollar default or to pay the $10 million in principal that was ballooning in February 1994.  Id.

### D.    The 1994 Transactions

Because Appellants were in default, had no money and had lined up no alternative source of financing in late 1993 and early 1994, rather than be subject to foreclosure[6], Dr. Chuang (Appellants' principal)[7] and Joseph Chu

---

[6]      As a result of the defaults, NYGF was entitled to foreclose on the Property and would have done so, absent a resolution with the Appellants.  JA _ and _ [DX QQ and RR] and JA _ - _ and _ [Tr. at 1073:10-1074:4 and 1108:19-21].

[7]      During these negotiations, Dr. Chuang was represented by his attorney, Edwin Eubank.  JA _ and _ [Tr. at 624:17-25 and 814:10-17].

10

negotiated a new agreement, which closed on February 25, 1994. Id.; JA _ [JSF ¶¶ 11-12 and 14]; JA _ [JSX 2]; JA _, _, and _ [Tr. at 188:9-15; 1162:12-25; and 1163:7-11].

Under the Sale Leaseback Agreement, Appellants transferred title to the Property to GBI, a company formed by Joseph Chu for that purpose.[8] JA _ [JSF ¶ 14]; JA _ - _ and _ [Tr. at 188:20-189:5 and 1163:7-11]. In addition, GBI assumed liability on the Appellants' $10 million debt to NYGF, thereby effectively canceling Appellants' liability on their $10 million debt to NYGF. JA _ [JSF ¶ 19]; JA _ and _ [JSX 30 and 31]; JA _, _-_, and _ [Tr. at 706:22; 816:1-817:16; and 1165:16-20].

Pursuant to the Sale Leaseback Agreement, GBI leased the Building back to the Appellants for a period of two years with no renewal right (the "Sale Leaseback Period"). JA _ and _ [JSX 1 and 2]; JA _ [JSF ¶ 15]; JA _ [Tr. at 1163:17-18]. The lease was a "triple net lease" that required Appellants to pay the agreed upon rent to GBI, as well as all taxes, insurance, and maintenance expenses. JA _ [JSX 2]; JA _ [JSF ¶ 15]; JA _ [Tr. at 1163:12-17]. To assist the Appellants' cash flow during the term of the lease, Joseph Chu agreed to

---

[8] In his March 20, 1996 ruling adjudicating an adversary proceeding brought in Plaintiffs' 1995 bankruptcy case, the Honorable Jeffrey Gallet, United States Bankruptcy Judge for the Southern District of New York, expressly held (1) that the 1994 deed from Plaintiffs to GBI conveyed title to the Property in fee simple to GBI and (2) that the Lease and option to repurchase expired by their own terms on February 25, 1996. Judge Gallet's decision was subsequently affirmed in all respects by the District Court (In Re: Uni-Rty Corp., No. 96 Civ. 4573, 1998 WL 299941 (S.D.N.Y. Jun. 9, 1998)) and this Court (In Re: Uni-Rty Corp., 175 F.3d 1008, 1999 WL 177273 (2d Cir. Mar. 26, 1999)).

defer 50% of the rent until the end of the lease.  JA _  [JSX 2]; JA _ [JSF ¶¶ 15 and 16]; JA _ - _ [Tr. at 1163:23-1164:6].

Contemporaneously, Joseph Chu also loaned Appellants an additional $3 million so that they would have funds to pay their delinquent real estate taxes and interest arrears, as well as an additional $316,000 in working capital.  JA _ [JSF ¶ 18]; JA _  and _ [PX 145 and 297]; JA _ - _ and _ - _ [Tr. at 272:22-273:9; and 1164:16-1165:6].  To assist the Appellants' cash flow, the $3 million note provided for interest-only payments (at 10% interest) and deferral of 50% of the interest payments and the entire principal until the end of the lease term. JA _ [PX 145]; JA _ [JSF ¶ 20]; JA _ - _ and _ [Tr. at 818:13-819:11; and 1166:2-1166:4].   As Appellants conceded, the deferred lease and interest payments improved Appellants' cash flow.  JA _ [JSF ¶ 16]; JA _ [Tr. at 1163:23-1164:6].

Under the Sale Leaseback Agreement, Appellants also received an option to purchase the Building during the two-year Sale Leaseback Period *so long as they were not in default*.  JA _ [JSX 2]; JA _ [JSF ¶ 17].  In order to exercise the repurchase option, Appellants were required to pay a $10 million purchase price, plus repayment of the $3 million loan from Joseph Chu, plus repayment of the deferred interest and lease payments.  JA _ [JSX 2]; JA _ [JSF ¶ 17]; JA _ [Tr. at 1164:7-10].  Assuming the full amount of deferred rent ($1 million) and

12

the full amount of deferred interest ($300,000), Appellants would have been required to come up with $14.3 million dollars in order to exercise their repurchase option. The Sale Leaseback Agreement required Appellants to repurchase the Building if they recovered $13 million or more in their then-pending lawsuit against the FDIC.[9]   JA _ [JSX 2 at § 13.22]; JA _ - _ [Tr. at 274:22–275:18].

Dr. Chuang admitted that the Sale Leaseback Agreement was the only option available to the Appellants to avoid foreclosure. JA _ [Tr. at 1154:8-17]. Through the Sale Leaseback Agreement, Appellants obtained two years to turn the Building around, in effect betting that the market would turn upward during that period or that they would recover a large judgment or settlement in their suit against the FDIC and have the funds to repurchase the Building.   JA _ [JSX 2]; JA _ [Tr. at 274:22–275:18].  Neither of those events occurred.  Id.

### E.   Appellants' Immediate Default Under the 1994 Agreements

After the 1994 transactions, the Appellants fell back into default.  They failed to pay their property taxes due in January 1995 and also failed to pay

---

[9]      Although the Sale Leaseback Agreement referred to the FDIC, Dr. Chuang testified at trial that this was a typing error and in fact the pending lawsuit and potential settlement was with the OCC, not the FDIC. JA _ - _ [Tr. at 274:22–275:7].  Chuang had sued the OCC to recoup funds from the allegedly wrongful closing of the Golden Pacific Bank. JA _ [Tr. at 273:13-19].  The bank had been closed by the OCC and Dr. Chuang had been convicted of 22 federal felony counts including wire fraud, making false statements, misapplication of bank funds and conspiracy to defraud. United States v. Chuang, 897 F.2d 646, 647-8 (2d Cir. 1990); JA _ and _ [DX A and B].  For these crimes, Dr. Chuang served three years in federal prison from 1989-1992.

their lease payments for May, June and July 1995.  JA _ [JSX 51]; JA _ [PX 331]; JA _ [DX P]; JA _, _ and _-_ [Tr. at 283:11-23; 284:17-21; and 819:20-827:19].    Thus, as of mid-July 1995, Appellants' defaults amounted to $216,588.77, excluding the real property tax payment due in July 1995, which they also did not pay.  JA _ [JSX 51]; JA _ [PX 331]; JA _ [DX P]; JA _ - _ [Tr. at 819:20-827:19].   The failure to make those payments unquestionably constituted a default under their lease.  See JA _ [JSX 2] at § 10.1.1 (stating that failure to pay rent constitutes a default); Id. at § 10.1.5 (stating that any monetary default constitutes a default under the Lease).  A default notice was sent to the Appellants outlining the defaults, but Appellants failed to cure.  JA _ [PX 331]; JA _ [DX P].  It is undisputed by Appellants that GBI had the right to evict Appellants from the Building as a result of these defaults, and it did so in July 1995.  JA _ [PX 331]; JA _ [Tr. at 305:22–306:3].

**ARGUMENT**

**STANDARDS OF REVIEW**

**Judgment as a Matter of Law**

This Court reviews the denial of a motion for judgment as a matter of law *de novo*.  Brutus v. Silverseal Corp., 439 F. App'x 28, 29 (2d Cir. 2011).

Under Fed R. Civ. P. 50(b), judgment as a matter of law is mandated where "there is either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guesswork, or the

14

evidence is so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." <u>DeFalco v. Dirie</u>, 978 F. Supp. 491, 494 (S.D.N.Y. 1997) (entering judgment as a matter of law where no causation established). Where, as here, "there can be but one conclusion as to the verdict that reasonable [persons] could have reached," (<u>Schlaifer Nance & Co. v. Estate of Warhol</u>, 119 F.3d 91, 98 (2d Cir. 1997)), the verdict must be set aside and a judgment entered in defendants favor as a matter of law. <u>See Clamyer Int'l, Inc. v. Shurtape Techs., Inc.</u>, No. 98 Civ. 4510, 1999 WL 1225253, at *6-8 (S.D.N.Y. Dec. 21, 1999) (granting defendant's motion for judgment as a matter of law pursuant to Rule 50(a) because plaintiff failed to present sufficient evidence of its breach of contract claim); <u>Merrill Lynch Interfunding, Inc. v. Argenti</u>, 155 F.3d 113, 120 (2d Cir. 1998) (holding District Court erred in failing to grant post verdict judgment as a matter of law where there was "no legally sufficient evidentiary basis for a reasonable jury to find [a breach of contract].")

### Motion for a New Trial

This Court reviews the denial of a Rule 59 motion for abuse of discretion. <u>R.R. Love, Ltd. v. TVT Music, Inc.</u>, 282 F. App'x 91, 93 (2d Cir. 2008).

Unlike the standard under Rule 50(b), "[t]he trial court is empowered to do this even though there may be substantial evidence which would prevent the direction of the verdict." <u>Isley v. Motown Record Corp.</u>, 69 F.R.D. 12, 16

(S.D.N.Y. 1975).  In fact, pursuant to Fed. R. Civ. P. 59, the Court may

independently weigh the evidence and grant a new trial if the jury has "reached

a seriously erroneous result," notwithstanding that substantial evidence exists in

support of the verdict.  Id.; R.R. Love, 282 F. App'x at 93.

## POINT I

### THE DISTRICT COURT PROPERLY GRANTED
### SUMMARY JUDGMENT ON APPELLANTS' RICO CLAIMS

NYGF joins in the arguments made by the Chu Appellees in Point I of

their brief on this appeal.

## POINT II

### APPELLANTS FAILED TO PROVE PROXIMATE
### CAUSE ON THE BREACH OF CONTRACT CLAIM

Appellants alleged that NYGF breached the 1990 Agreement.  The jury

found in Appellants' favor and awarded $8.25 million in damages on that claim.

NYGF moved for judgment as a matter of law, or alternatively, for a new trial

arguing, among other things, that Appellants had failed to prove proximate

cause.  The District Court denied NYGF's motion, holding that various conduct

by NYGF "significantly harmed the financial viability of the Property such that

[Appellants] were unable to either satisfy their financial obligations under the

1994 lease agreement or exercise their option to repurchase the Property."

SSA-3.  This decision was erroneous.

16

## A.    NYGF Did Not Cause Appellants' Loss of the Property

In order to establish the causation on their breach of contract claim, Appellants had to show that NYGF's purported breach of the 1990 Agreement was a proximate cause of their injury - - i.e., that there was a direct relationship between Appellants' claimed injury and NYGF's alleged breach.  See National Mkt. Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages.").  Put another way, "the plaintiff must demonstrate more than simply that defendant breached its contract and that the plaintiff suffered damage.  *Plaintiff cannot recover if it would have suffered the harm regardless of defendant's actions*."  Point Productions A.G. v. Sony Music Entm't, Inc., 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (emphasis supplied).  Thus, if Appellants' loss of the Building was inevitable, regardless of NYGF's purported breach, NYGF "cannot be held responsible for that injury." Id. at 344.[10]

The evidence adduced at trial overwhelmingly established that Appellants did not have the financial resources to  keep the Building, either by curing their

---

[10]    Accord Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc., No. 96 Civ. 7874, 2002 WL 826956, at n.5 (S.D.N.Y. May 1, 2002) ("Under New York law, a plaintiff must prove that its injury was proximately caused by the defendant's breach. . . Thus, if the injury would have occurred in the absence [defendants' conduct]" the element of causation has not been met).

defaults prior to February 1994 (the maturity date of the 1990 Loan) or exercising their repurchase option during the Sale Leaseback Period, and that they would have lost the Building regardless of any conduct on the part of NYGF.  Quite simply, Appellants presented no evidence demonstrating their financial ability to retain or repurchase the Building: no loan commitments or applications, no financial analyses, no bank records, no income records, no expert testimony -- not a shred of evidence to show how they could have avoided foreclosure in 1994 (other than through the Sale Leaseback Agreement) or how they could have raised the $14.3 million necessary to exercise the repurchase option.  JA _ at §§ _ and _  [JSX 2 §§ 2.1 and 13.3]; JA _ [PX 145]; JA _, and _ - _ [Tr. at 282:5-9; and 818:13-819:11].[11]

Indeed, Dr. Chuang candidly admitted that Appellants did not have the financial wherewithal to dig themselves out:

> THE COURT: If you had the money, why would you have entered into this sale leaseback arrangement that we referred to?  You could have just paid it off.
>
> THE WITNESS: The company itself had no money, no money to pay the 12 million or the $10 million. The company owned the property.  It had a cash flow problem.  They couldn't have.  They must borrow money.

---

[11]    Dr. Chuang conceded that he never put in an application with any bank to raise the funds he needed to repurchase the Building at any time in 1994.  JA _ - _ [Tr. at 1148:25–1150:16].  Nor did he approach any known investors for financial assistance.  JA _ [Tr. at 301:13-17].  As an individual convicted of 22 federal felony counts, including, among other crimes, false statements, wire fraud and misapplication of bank funds, Chuang was likely well-aware he would be unable to obtain financing from a conventional lender.

THE COURT: So your answer is you didn't have the money?

THE WITNESS: Yes.

JA _ [Tr. at 1154:8-17].

The undisputed evidence reflecting Appellants' cash flow during calendar years 1994 and 1995 bears this out.  Plaintiff Uni-Rty had gross revenues of only $595,685.00 (*i.e.*, before operating and other expenses) for the calendar year 1994 and, for the following year, gross revenues of $421,266.00 through the date of the filing of their Voluntary Bankruptcy Petition on or about September 21, 1995.[12]  JA _ [DX N]; JA _- _[Tr. at 557:21-558:23].  The record is devoid of any evidence whatsoever relating to GPLP's gross revenues.  Thus, during the period January 1, 1994 through September 21, 1995, Appellants had gross revenues of no more than $1,016,951.00.

By Appellants' own admission, the record contains no documentation reflecting their gross income for the period of September 21, 1995 through the expiration of the Sale Leaseback Period on February 24, 1996.  JA _, _- _ and _ - _ [Tr. at 566:15-20; 569:3-570:14; and 1150:19-1151:6].  But even using Appellants' most optimistic assumptions, their additional gross income during

---

[12]     It is undisputed that prior to the filing of the Bankruptcy petitions, neither Uni-Rty nor GPLP had ever filed state or federal income tax returns.  JA _ [Tr. at 572:4-13].

19

this period would have been no more than $435,000.00. JA _ [Tr. at 631:21-23].[13]

Accordingly, Appellants' total gross income for the period January 1, 1994 through February 24, 1996 could not have been more than $1,451,951.00, *before* deducting all operating expenses (such as rent owed to GBI under the Sale Leaseback Agreement) as well as all other monthly expenses, including tax arrearages. It is simply inconceivable on this record that Appellants could have come up with the money they needed - - more than $14,000,000 - - to buy the Building back.

## B.  None of the Purported Breaches Identified by the District Court Caused Appellants' Damages

Appellants were deliberately vague in the District Court about precisely what conduct by NYGF constituted a breach of the 1990 Agreement. Indeed, that agreement required very little of NYGF other than providing $10 million in financing. But even assuming for purpose of this appeal that NYGF breached the agreement, none of the purported breaches identified by Judge Daniels was the proximate cause of the damages awarded by the jury.

In the Post Trial Decision, the District Court found that NYGF engaged in various conduct that "interfered with the development and that was contrary

---

[13]    These calculations assume Appellants' unsubstantiated testimony that the monthly rent roll during the post-bankruptcy period was $87,000 per month, and also assume that all rent would have been collected throughout the lease term (October 1995 through February 24, 1996).

to the best interest of the Property" and identified four specific actions taken by NYGF that constituted such interference. SSA-3. Even if the identified conduct constituted a breach, it could not have been the cause of the damages awarded; Judge Daniels erred in concluding that the conduct he identified prevented Appellants from exercising the repurchase option.

First, Judge Daniels referred to NYGF "instructing tenants to not pay rent to [Appellants]" (SSA-3), citing to evidence regarding a purported opportunity to lease space to OTB (Tr. at 362 and 364-6). This had nothing to do with rent payments by existing tenants. The District Court also cited testimony regarding statements allegedly made to tenants in April 1995 (Tr. at 1115). By April 1995, however, Appellants had long since fallen into arrears, under the terms of the Sale Leaseback Agreement, the loan from Joseph Chu, and with respect to real estate taxes owed. There was no evidence as to how, absent these statements, Appellants could have satisfied their past obligations, let alone exercised the repurchase option.[14]

Next, the District Court pointed to NYGF "arbitrarily refusing to approve lucrative lease opportunity." SSA-3. The evidence cited by the District Court (Tr. 362, 364 and 631) relates solely to discussions with OTB in 1995, and that

---

[14]    Plaintiffs' claim for tortious interference with leases was a separate cause of action - not part of the breach of contract claim - and it was specifically abandoned by Plaintiffs before the jury was even charged. JA _-_ [Tr. at 952:19–953:4].

21

evidence did not come close to establishing the existence of a "lease opportunity and other new tenants." The only thing exchanged between OTB and Appellants in 1995 was a "preliminary letter"; there was "no agreed upon term," and no draft leases were ever exchanged. JA _ [Tr. at 643:6-21]. Indeed, during trial, Judge Daniels himself recognized that "the OTB discussions had not progressed to a level that they had come close to really closing a deal." JA _ [Tr. at 953:7-9].[15] Moreover, as Judge Daniels also noted during trial, Appellants "had no right to lease the property to OTB in September of '95, when they had already defaulted on the payments of the loan. A lessee can't sublease a piece of property when they have already refused to pay their rent." JA _ [Tr. at 953:11-15]. In any event, there was no evidence at trial that an alleged failure to approve an OTB lease proximately caused the loss of the Building. Nor could there have been. Given the vast shortfall between the amount needed to repurchase and Appellants' resources, a lease with OTB could not have bridged the gap.[16]

---

[15]     Judge Daniels thus concurred with Judge Sprizzo, who on a similar record, had found that the OTB opportunity was preliminary at best, and any attempt to link the purported OTB lease "opportunity" with a cognizable damages claim was impermissibly speculative. Uni-Rty Corp. v. Guangdong Bldg., Inc., 464 F. Supp. 2d 226, 231 (S.D.N.Y. 2006).

[16]     Even assuming that OTB would have entered into a lease in September 1995 (i.e., despite Appellants' status as debtor in bankruptcy and notwithstanding their deep defaults under the Sale Leaseback Agreement), Appellants still failed to prove causation. Taking Appellants' trial testimony at face value and assuming that OTB would have rented 14,000 square feet in the Building at the per annum rate of $35 per square foot (JA _ [Tr. at 630:1-2 and 9-13]), Appellants arguably would have generated, at best, approximately $204,166.66,

Judge Daniels also identified as a material breach that NYGF "engag[ed] in secret negotiations to extend the 1990 HSBC mortgage loan..."[17]  SSA-3. Even if these "secret negotiations" breached the Agreement, they did not cause Appellants' damages of $8.25 million.  At most, this breach would entitle Appellants to recover the value – if any – of knowing of the refinancing deal with HSBC, and the value – if any – of knowing that HSBC would not have foreclosed on NYGF (and then collaterally on Appellants) on its own, but rather would have assisted NYGF's foreclosure on Appellants (in both cases prior to the consummation of the 1994 Sale Leaseback Agreement).

There is nothing in the record from which a jury could have rationally gleaned a "value" that could be ascribed to such disclosures.  There was no evidence demonstrating that Appellants would or could have done anything differently respecting the Property had NYGF made the disclosures it was,

---

in additional revenue for the period October 1, 1995 through the end of February 1996 (before deducting operating and other expenses).  On this record, it is absurd to suggest that a five-month tenancy by OTB would have rescued Plaintiffs from the situation they faced in February 1996, that is, their existing defaults in the amount of $750,687.03 (JA _ and _ [JSX 2 and 51]; JA _ [PX 145]; JA _ [DX P]) and their search for an additional $14.3 million they needed to repurchase the Building.  JA _ [JSX 2 §§ 2.1, 13.3]; JA _ [PX 145]; JA _, _ - _ and _ [Tr. at 282:5-9; 818:13-819:1; 819:9-11].  In addition, even if you added these highly speculative amounts related to OTB with those discussed in Point I.A., supra, Appellants still would have been far short of having the requisite funds.

[17]    The District Court ignored, however, that Joseph Chu had personally guaranteed the $9 million borrowed by NYGF from HSBC.  JA _ [JSF ¶ 13].  Thus, any negotiations that Mr. Chu may have had regarding the 1990 loan related to a debt for which he was personally responsible.  Moreover, it was NYGF - not Appellants - that had borrowed money from HSBC.  It would not have been unusual, then, for NYGF to have negotiated its extension without Appellants' participation.

according to Appellants, contractually obligated to make. Indeed, during the trial, Judge Daniels recognized this fundamental failure of proof:

> JUDGE DANIELS: But as Judge Sprizzo says, what would have been different? Give me a scenario that would have played itself out other than the scenario that your client doesn't have the money anymore?
>
> \*\*\*
>
> JUDGE DANIELS: *He didn't have enough money to develop the property. He didn't have any revenue generated from the property. He didn't have anybody who was willing to give him another loan*.
>
> MR. BYRD: That's not true, Judge. The testimony was—
>
> JUDGE DANIELS: *That's what the testimony was*.

JA _ and _ [Tr. at 1207:15-18; and 1208:19-25] (emphasis supplied).

Put simply, NYGF did not cause the loss of the Building by failing to make certain disclosures to Appellants about its dealings with HSBC or by "lying" about the imminence of an HSBC foreclosure in late 1993. Appellants lost the Building for no other reason than their own defaults under the 1990 Loan and their own lack of the financial wherewithal needed to cure those defaults.

Finally, the District Court found that NYGF breached the contract by "refusing to cooperate and assist [Appellants], even in renovating the Property so that [Appellants] could obtain full occupancy." SSA-3. But there is no evidence that NYGF (or the other Appellees) were asked to assist with

renovations or that the contract even required them to do so.  The testimony cited by Judge Daniels established only that in late 1992 or early 1993, Dr. Chuang's role was to renovate the Property and that Joseph Chu was supposed to "solve the financial need."   JA __. [Tr. at 158]  This is precisely what transpired when the Chu Appellees refinanced the loan with HSBC in 1994, extended additional credit to Appellants and entered into the Sale Leaseback Agreement.  Moreover, there was no evidence at trial that any failure by NYGF to "cooperate" with Appellants was the proximate cause of their loss of the Building, rather than their own lack of resources.

## POINT III

### THE DAMAGES AWARD ON THE BREACH OF CONTRACT CLAIM SHOULD BE SET ASIDE

#### A.    The Damages Awarded Constitute an Impermissible Windfall

The jury awarded $8,250,000 to Appellants on their breach of contract claim.  Judge Daniels sustained the award, noting that it "was based upon the loss of the Property" and the "original purchase price [of] $8.5 million" Appellants paid to the FDIC to acquire the Building in 1989.  SSA-4.  That ruling ignores the undisputed evidence that over $7 million of that purchase price was funded by loans Appellants never repaid.  JA _, _, _ [PX 24, 29, 39]; JA _ [DX NN]; JA _ [Tr. at 425:12-21].  This damages award must be set aside.

It is well-settled in New York law that damages for breach of contract are intended to compensate a party for the actual monetary loss caused by the breach.  See The Upper Deck Co., LLC v. Breakey Int'l, BV, 390 F. Supp. 2d 355, 362 (S.D.N.Y. 2005) ("damages in a breach of contract action are generally measured by the non-breaching party's *actual loss*.") (emphasis supplied).  In other words, damages for breach of contract are intended to place a party in the same position it would have occupied if the breach had never occurred; *they are not designed to create windfall recoveries*.  See Waxman v. Envipco Pick Up & Processing Svcs., Inc., No. 02 Civ. 10132, 2006 WL 236818, at *5 (S.D.N.Y. Jan. 17, 2006) (("[P]laintiff in [a] breach of contract action [is] 'not entitled to be put in a better position by the recovery than if [defendants] had fully performed the contract.'") (quoting Miller v. Robertson, 266 U.S. 243 (1924)).  Thus, "plaintiff cannot prevail on a breach of contract theory unless he sustained *actual damages* as a natural and probable consequence of such breach." Rakylar v. Washington Mut. Bank, 858 N.Y.S.2d 759, 760 (N.Y. App. Div. 2008) (emphasis supplied).

The jury's $8,250,000 damages award does not compensate Appellants for an actual monetary loss.   The undisputed evidence adduced at trial established that:

- Appellants funded the 1989 purchase price "paid" to the FDIC for the Property with at least $7,125,000 in loans,

26

> including a $6,025.000 purchase mortgage loan extended by the FDIC and an $800,000 second mortgage loan extended by NYGF.  JA _ and _ [PX 29 and 39]; JA _ [DX NN]; JA _ [Tr. at 425:12-21].
>
> - In 1990, Appellants refinanced the 1989 loans, borrowing $10,000,000 from NYGF.  The proceeds from these loans were used, among other things, to pay off the FDIC loan at a discount and provide Appellants with additional funds for construction and renovation work at the Property.  JA _ and _ [PX 96 and 104]; JA _ and _ [DX QQ and RR]; JA _ - _ [Tr. at 350:12-352:16].
>
> - Appellants never repaid the principal balance of NYGF's $10 million in loans.  Instead, in 1994, as part of the Sale Leaseback Agreement, GBI assumed Appellants' debt.  JA _ and _ [JSX 30 and 31]; JA _-_ [Tr. at 1074:12-1075:2].

Thus, even assuming, as the District Court did, that the $8.5 million purchase price was a proper starting point for the jury's damages analysis, Appellants incurred no more than $1,125,000 actual out-of-pocket cash expenditures for the repurchase of the Property in 1989.  The balance of the purchase price was "paid" with borrowed funds that Appellants never repaid.  Thus, awarding damages in the amount of the full purchase price puts Appellants in a better position than they would have been in absent the alleged breach.

Moreover, in 1994, as part of the Sale Leaseback Agreement, GBI assumed the $10 million debt that Appellants owed to NYGF.  JA _ and _ [JSX 30 and 31]; JA _ [Tr. at 1074:12-24].  In effect, GBI paid Appellants $10 million for property apparently valued by the jury at $8.25 million.  JA _ [Tr. at

708:4-11].  This assumption by GBI of the $10 million in indebtedness more than made Appellants whole.  As a result, any damage award linked to the 1989 purchase price constituted a windfall and must be set aside.

### B.    The District Court's Justification of the Damages Award Was Flawed

In upholding the jury verdict on damages, the District Court cited the "original purchase price" in 1989 as a "reasonable estimate" of the Building's value.  SSA-4.  This reasoning ignored controlling law.  "It is a fundamental proposition of contract law, including that of New York, *that the loss caused by a breach is determined as of the time of breach....*"  Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 825 (2d Cir. 1990) (emphasis supplied).  Accord Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 384 (2d Cir. 2006) ("It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach.").  Equally important, where "the breach involves the deprivation of an [asset] with a determinable market value, *the market value at the time of the breach is the measure of damages*."  Sharma, 916 F.2d at 825 (emphasis supplied).

Judge Daniels therefore erred in accepting the "original purchase price" in 1989 as a "reasonable estimate" of damages.  As articulated by the District Court, any identifiable "breaching" conduct (see discussion *supra* at Point III.B.) occurred no earlier than the end of 1993 or the beginning of 1994.  SSA-

3.   But Appellants offered no cognizable evidence (such as a professional appraisal) of the market value of the Building at that time.  This is not sufficient proof of market value at the time of the breach.  E.g., PPX Enters., Inc. v. Fredericks, 94 F. Supp. 2d 477, 484-85 (S.D.N.Y 2000) (after bench trial, court held that party failed to prove contract damages by submitting appraisals purporting to assess the value of equipment some six years prior to breach); Webster v. Di Trapano, 494 N.Y.S.2d 550, 551 (N.Y. App. Div. 1985) (In calculating damages for breach of agreement to purchase home, proper measure of damages was difference between contract price and market price of home at time of breach, and trial court erred in using as base figure the sale price of property some 11 months after breach.).  See also In re Featherworks Corp., 25 B.R. 634, 642 (Bankr. E.D.N.Y 1982) ("[A]n appraisal two years old in the volatile real estate market this country has been experiencing over the past few years cannot be deemed probative of its present value.")

## POINT IV

### THE DISTRICT COURT ERRED IN DENYING NYGF'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE FRAUDULENT INDUCEMENT CLAIM

NYGF joins the arguments made by the Chu Appellees in Point II of their brief on this appeal in opposition to the District Court's failure to set aside the verdict on the fraudulent inducement claim.  Appellants failed to adduce any

29

evidence establishing that they suffered a compensable loss caused by the supposed fraud. The jury's $250,000 verdict on this claim should be set aside.

## CONCLUSION

For the foregoing reasons this Court should (1) reverse the Judgment in Appellants' favor on their claims for breach of contract and fraudulent inducement; and (2) affirm the District Court's 2006 summary judgment decision dismissing Appellants' RICO claims.

Dated:  New York, New York
        July 17, 2013

Respectfully Submitted,

VANDENBERG & FELIU, LLP

By:  /s/ John C. Ohman
     John C. Ohman (JO-0655)
     Debra Kobrin Levy (DK-3651)
60 East 42nd Street, 51st Floor
New York, New York 10165
(212) 763-6800 Telephone
(212) 763-6810 Facsimile

*Attorneys for Appellee-Cross-Appellant*
*New York Guangdong Finance, Inc.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,755 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 with 14-point Times New Roman font.

Dated:    July 17, 2013

                                     /s/ John C. Ohman
                                       John C. Ohman

# CERTIFICATE OF SERVICE

The undersigned member of the Bar of this Court hereby certifies that on July 17, 2013, the foregoing PAGE PROOF OPENING BRIEF OF APPELLEE CROSS-APPELLANT NEW YORK GUANGDONG FINANCE INC. was filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit.

I further certify that on July 17, 2013, true and correct copies of the foregoing were served via FedEx upon the following:

Gregory G. Garre
Katherine I. Twomey
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

Paul Batista, P.C.
26 Broadway, Suite 1900
New York, NY 10004

Tucker H. Byrd
MORGAN & MORGAN, P.A.
20 North Orange Avenue, Suite 1600
Orlando, FL 32801

William J. Schwartz
COOLEY LLP
1114 Avenue of the Americas
New York, NY 10036


_____/s/John C. Ohman_____
John C. Ohman